In the Matter of NANCY A. ACQUAFREDDA, Appellant. JOHN M. CZYGIER, JR., Respondent.

Second Department, April 19, 1993

### APPEARANCES OF COUNSEL

*O'Connor & Hayes, P. C.,* East Rockaway *(James E. Hayes, John R. O'Connor* and *Robin Mary Heaney* of counsel), for appellant.

*Gatz, Arnoff & Czygier,* Riverhead *(John M. Czygier, Jr.,* of counsel), respondent *pro se.*

### OPINION OF THE COURT

ROSENBLATT, J.

On this appeal we are called upon to review a decree of the Surrogate relative to the distribution of the proceeds of a wrongful death action and to undertake the first appellate review of the so-called "Kaiser formula" *(Matter of Kaiser,* 198 Misc 582). The decedent was survived by his wife and their two infant children. The Surrogate ruled that the proceeds be divided in equal one-third shares among the decedent's widow and the two children. The widow has appealed, asserting that the Surrogate erred in making that allocation, and asks us to direct distribution according to the formula enunciated in *Kaiser.* In essence, under that formula each distributee would receive a percentage of the award in arithmetic proportion to the number of years of dependency for which that distributee would have looked to the deceased for support.[1] If *Kaiser* were applied, the widow's share would be 56.14%, the older child

---

1. Arithmetically, the formula is achieved by adding up all of the years of "dependency." The figure for each child is the number of years it would take to reach majority at 21. This age is normally used because parents are generally liable for the support of their children under 21 *(see,* Domestic Relations Law § 32 [3]; Family Ct Act § 413 [1] [a]; *Matter of Muccini,* 118 Misc 2d 38, 43). For the spouses, the length of anticipated dependency is measured by mortality tables. The figure used is the shorter life expectancy as between the spouses. The total number of years for the spouse and offspring constitute the denominator, and the respective number of years of "dependency" is the numerator for each of the distributees. In *Matter of Kaiser* (198 Misc 582, *supra),* the decedent had a 25.27-year life expectancy. The only child was one year old, with 20 years until majority. Adding 25.27 and 20, the total dependency years was 45.27. The wife thus obtained a distributive share of 55.8%, and the child 44.2% *(Matter of Kaiser, supra,* at 584).

would receive a 20.74% share, and the younger child a 23.12% share.

EPTL 5-4.4 governs the distribution of the funds received. The statute requires that the moneys be distributed to those entitled (in this case the widow and two children) "in proportion to the pecuniary injuries suffered by them" (EPTL 5-4.4 [a] [1]).

For reasons that follow, we conclude that there is no imperative for the automatic application of *Kaiser (supra),* that the Surrogate is vested with discretion and with equitable powers as to the proportional allocation of wrongful death proceeds, and that the Surrogate did not improvidently exercise his discretion in declining to utilize the *Kaiser* formula.

We note at the outset that the *Kaiser* formula is not mandated by statute. EPTL 5-4.3 (a) and 5-4.4 (a) (1) and its predecessors contemplate that the class of people entitled to share in the recovery are to do so according to their proportional losses, but the statute does not recite any particular formula. The statutory provisions are, in pertinent part, as follows: "§ 5-4.3 Amount of Recovery. (a) The damages awarded to the plaintiff may be such sum as the jury or, where issues of fact are tried without a jury, the court or referee deems to be fair and just compensation for the pecuniary injuries resulting from the decedent's death to the persons for whose benefit the action is brought".

"Section 5-4.4 Distribution of damages recovered * * * (1) Such damages shall be distributed by the personal representative to the persons entitled · thereto in proportion to the pecuniary injuries suffered by them, such proportions to be determined after a hearing, on application of the personal representative or .any distributee, at such time and on notice to all interested persons in such manner as the court may direct".

Since 1950, the so-called *Kaiser* rule has lived almost entirely in the domain of the Surrogate's Courts, where it has undergone extensive scholarly discussion, some deferential, some disapproving.

The criteria for apportioning wrongful death proceeds (and the arguments for or against the so-called *Kaiser* approach) are best understood in the light of their origins and development. The question of allocation is not easily understood in historical isolation, considering that our legal system, until

the midnineteenth century, did not even recognize the concept of a wrongful death action, let alone the distribution of its proceeds.

## LORD CAMPBELL'S ACT

At common law, a person who received a personal injury could proceed against the tortfeasor, but if the tortfeasor died before the injured plaintiff recovered for the tort, the plaintiff's cause of action died as well. Conversely, if the injured person died before gaining a judgment against the tortfeasor, the cause of action terminated. The common law recognized no independent cause of action on behalf of the victim's heirs or dependents for their loss at the victim's death *(see,* Prosser and Keeton, Torts §§ 125A, 127, at 940, 945 [5th ed]). As a tort recovery was thought to be a matter of personal vengeance and punishment between the transgressor and victim, death erased the basis of a civil action between them. Under that view, the legal successor of the person killed "was neither the wronged nor the wrongdoer", and was therefore thought to have no personal involvement in the wrong (Smedley, *Wrongful Death—Bases Of The Common Law Rules,* 13 Vand L Rev 605, 608 [1960]).

As adherents of the common law, the New York courts denied recovery for wrongful death (before the statutory change) as explained in an early opinion of the New York Court of Appeals *(see, Whitford v Panama R. R. Co.,* 23 NY 465, 470, 475-476; *see also, Green v Hudson Riv. R. R. Co.,* 28 Barb 9, *affd* 2 Abb Ct App 277, *affd* 2 Keyes 294; *see also, Sharrow v Inland Lines,* 214 NY 101, 103-104). To overturn the common-law restriction, it was necessary to enact legislation in the form of wrongful death statutes[2] *(see,* Annotation, *Modern Status of Rule Denying a Common-Law Recovery for Wrongful Death,* 61 ALR3d 906) to compensate the aggrieved families for their pecuniary loss as a result of persons killed by wrongful act, thus creating a new and distinct cause of action in favor of certain designated beneficiaries (Malone, *The Genesis of Wrongful Death,* 17 Stan L Rev 1043, 1051

---

2. These are to be distinguished from statutory claims known as "survival actions" for personal injuries brought on behalf of the deceased. That came later (Decedent Estate Law §§ 119, 120 [L 1935, ch 795, §§ 2, 3], now EPTL 11-3.2, 11-3.3; *see, Holmes v City of New York,* 269 App Div 95, 97, *affd* 295 NY 615).

[1965]). This concept began with Lord Campbell's Act of 1846 (9 & 10 Vict ch 93).[3]

Following Lord Campbell's Act, every State Legislature enacted statutory remedies for wrongful death (see, Prosser and Keeton, Torts, at 945 [5th ed]; see also, Cooley, Torts § 211, at 108 [4th ed]). The statutes varied widely throughout the United States, and still do. Notably, there has been no single approach to measure or apportion damages (4 Harper, James and Gray, Torts § 24.2, at 459 et seq. [2d ed]; 2 Sedgwick, Damages § 571 et seq. [9th ed]; Restatement [Second] of Torts § 925).

One year after Lord Campbell's Act broke with the common law, the New York State Legislature enacted New York's wrongful death statute (L 1847, ch 450) which tracked the English version, with one important difference. Whereas Lord Campbell's Act provided that "the Jury may give such Damages *as they may think proportioned to the Injury* resulting from such Death to the Parties respectively for whom and for whose Benefit such Action shall be brought" (emphasis added) the New York version required that the amount recovered "be distributed to such widow and next of kin *in the proportions*

---

**3.** Lord Campbell's Act reads, in relevant part, as follows:

"WHEREAS no Action at Law is now maintainable against a Person who by his wrongful Act, Neglect, or Default may have caused the Death of another Person, and it is oftentimes right and expedient that the Wrongdoer in such Case should be answerable in Damages for the Injury so caused by him: Be it therefore enacted by the Queen's most Excellent Majesty, by and with the Advice and Consent of the Lords Spiritual and Temporal, and Commons, in this present Parliament assembled, and by the Authority of the same, That whensoever the Death of a Person shall be caused by wrongful Act, Neglect, or Default, and the Act, Neglect, or Default is such as would (if Death had not ensued) have entitled the Party injured to maintain an Action and recover Damages in respect thereof, then and in every such Case the Person who would have been liable if Death had not ensued shall be liable to an Action for Damages, notwithstanding the Death of the Person injured, and although the Death shall have been caused under such Circumstances as amount in Law to Felony.

"II. And be it enacted, That every such Action shall be for the Benefit of the Wife, Husband, Parent, and Child of the Person whose Death shall have been so caused, and shall be brought by and in the Name of the Executor or Administrator of the Person deceased; and in every such Action the Jury may give such Damages as they may think proportioned to the Injury resulting from such Death to the Parties respectively for whom and for whose Benefit such Action shall be brought; and the Amount so recovered, after deducting the Costs not recovered from the Defendant, shall be divided amongst the before-mentioned Parties in such Shares as the Jury by their Verdict shall find and direct".

*provided by law in relation to the distribution of personal property, left by persons dying intestate"* (L 1847, ch 450 [emphasis added]).

The New York statute gave the courts no room to exercise discretion in allocating recoveries. The distribution was automatic, as in intestacy, and impervious to the respective pecuniary deprivations of the beneficiaries *(Matter of Snedeker v Snedeker,* 164 NY 58).

After some amendment (L 1849, ch 256; L 1870, ch 78 [the latter gender-neutralized the statute, spelling out husbands as distributees]), the statute became part of Code of Civil Procedure §§ 1902-1904 (L 1880, ch 178), and then Decedent Estate Law §§ 130-133 (L 1920, ch 919), with ensuing changes relative to the class of beneficiaries, but leaving intact the provision that moneys recovered be distributed as in intestacy. Interpreting this provision, the courts often felt constricted, having no discretion to weigh individual losses, except in cases that arose under Federal statutes *(see, Taylor v Taylor,* 232 US 363).

In the 1930's, the most severe decisional criticism came from Kings County Surrogate Wingate, who described the inequity of intestacy distribution in a wrongful death case in which the deceased's husband was 80 years old, so that his wrongful death statutory share was fixed inappropriately high, given that his future "dependency" was vastly less than the two children with whom he shared equally *(see, Matter of Aronowitz,* 151 Misc 746; *see generally, Matter of Uravic,* 142 Misc 775; *Matter of De Martino,* 142 Misc 785; *Matter of Klein,* 162 Misc 589).

In 1949, the State of New York Law Revision Commission observed that the Legislature had obviously intended to compensate those who suffer pecuniary injuries, but provided that the distribution be made to statutory distributees without reference to pecuniary injury. The Commission called distribution by the rules of intestacy "illogical and unjust" (1949 Report of NY Law Rev Commn, at 226). The Commission found that "the principal defect in the present law is the requirement that damages for wrongful death must be distributed to the surviving spouse and next of kin of the decedent in the proportions fixed by the law of intestate succession (Decedent Estate Law, § 83), and not in accordance with the pecuniary injury of the decedent's dependents" (Report, *op. cit.,* at 233).

From the century-long period between the enactment of our first wrongful death statute until the Law Revision Commission study, the courts in New York had been allocating the shares in accordance with intestacy distribution, and we note that courts in some other States still do *(see,* Annotations, *Division among beneficiaries of amount awarded by jury or received in settlement upon account of wrongful death,* 171 ALR 204, 112 ALR 30, 14 ALR 516), but the irksome feature was that while such a distribution was often equitable, it did not sit well as a rule to be applied, no matter what *(Gross v Abraham,* 306 NY 525, 530). Accordingly, the Commission recommended that the Decedent Estate Law be amended to provide that damages to the surviving spouse and next of kin be allocated in proportion to their respective losses (1949 Report of NY Law Rev Commn, at 233).

This led to the enactment of Laws of 1949 (ch 639), effective April 16, 1949, which codified the recommendation and gave birth to *Kaiser (supra).*

### MATTER OF KAISER (198 MISC 582)

Not long after the 1949 amendment, the courts, mostly Surrogates, had their earliest occasions to invoke the "proportionality" concept under the new State statute. As we have seen, they had gained some practice in this, having distributed damages under the proportional loss concept in death actions arising under Federal statutes. *Matter of Kaiser* (198 Misc 582, *supra)* was the first officially reported case under the new statute, and although, by happenstance, the name of the party has been etched in New York's jurisprudence, the decision was no matter of happenstance, but is a landmark on the road paved by Lord Campbell. In *Kaiser,* Kings County Surrogate Richardson unhesitatingly applied the proportionality formula that Surrogates before him applied pursuant to Federal death statutes *(Matter of Gilbride,* 140 Misc 797 [Federal Employers' Liability Act]; *Matter of Uravic, supra* [Federal Employers' Liability Act]; *Matter of De Martino, supra* [Federal Employers' Liability Act]; *Matter of Klein, supra* [Death on the High Seas Act]; *see also, Matter of Nelson,* 168 Misc 161 [Jones Act]; *Matter of Bertrand,* 192 Misc 930 [Federal Employers' Liability Act]). Using actuarial tables, the Surrogate computed the relative time periods that each of the distributees would have looked to the deceased for support (a measure of "anticipated dependenc[ies]"), and calculated their proportional shares accordingly *(Matter of Kaiser, supra,* at 584).

Even without calculators, the arithmetic is straightforward and offers an easy rule of thumb. Although the *Kaiser* formula has been criticized as overly rigid, it must be remembered that the *Kaiser* court itself pointed out that the 21-year-old cutoff is not cast in stone, and that there may be room for deviation, as where a parent would support a child beyond majority if, for example, the child is disabled *(see, e.g., Matter of De Martino, supra).*

In the 1950's, 1960's, and into the 1970's, there was widespread and, in the main, largely unquestioned fidelity to the *Kaiser* concept *(e.g., Matter of Sintyago,* 198 Misc 776; *Matter of Von Schlichten,* 201 Misc 334; *In re Shecora,* 201 NYS2d 191; *Matter of Thompson,* 36 Misc 2d 638; *Matter of Vacca,* 42 Misc 2d 120; *Matter of Ward,* 84 Misc 2d 196; *Matter of Summrall,* 93 Misc 2d 420; *Matter of Bryant,* NYLJ, July 17, 1975, at 16, col 3; *Matter of Scott,* NYLJ, Aug. 31, 1976, at 12, col 2). Some courts explained that they were applying *Kaiser* because there was no evidence of any need to extend the minor's support beyond majority *(e.g., Matter of Volpe v Fireman's Fund Ins. Co.,* 54 Misc 2d 212), others regarded *Kaiser* as "advisory" *(Estate of Richards,* NYLJ, Aug. 27, 1975, at 8, cols 2, 5), and one court followed the formula because it resulted in a substantially larger amount for a younger child whose condition merited it *(Matter of Trofemuk,* 52 Misc 2d 148; *see also, Matter of Gary,* 79 Misc 2d 419).

Some courts, however, deviated from the formula on equitable grounds by extending support for disabled children *(see, Matter of Yacano,* NYLJ, Aug. 16, 1957, at 3, col 7; *In re Smith,* 235 NYS2d 414; *Matter of Heindel,* 51 Misc 2d 26; *Matter of Washington,* 16 Misc 2d 577), or by making slight adjustments *(see, Matter of Cook,* 63 Misc 2d 537). By and large, however, for the first 20 or 25 years of its life, the *Kaiser* rule was applied far more often than not, with deviations based on special circumstances *(see,* Roth, Wills, Estates and Surrogate Practice, *Distribution of Proceeds From Wrongful Death,* NYLJ, June 25, 1979, at 1, col 1).

A number of decisions then began to appear, ascribing possible inequity in the formula itself, based largely on its age emphasis, and asserting that if one of a young couple is killed, the survivor, having a long period of "dependency," will gain a *Kaiser* share many times that of the offspring. For example, under *Kaiser (supra),* a 15-year-old child having only six years of formulaic "dependency" will acquire a share only one fifth

that of a surviving young widow or widower with a 30-year "dependency" period.

Concluding that in some instances a mechanical *Kaiser* apportionment may work to the disadvantage of the children, some courts declined to apply the formula. In *Matter of Maerkle* (44 Misc 2d 617), the court, to avert an incongruous result, awarded three children (all nearing age 21) enough for their support until majority, and allocated the rest equally among them, an approach later followed in *Matter of Green* (127 Misc 2d 266; *see also, Mahler v American Airlines,* 49 Misc 2d 693, 699).

Other courts made similar adjustments in favor of children by exercising greater flexibility than the formula calls for *(e.g., Matter of Inglima,* 13 Misc 2d 910 [widow and infant given equal shares]; *Matter of Singleton,* 96 Misc 2d 169 [widower and child given equal shares]; *Estate of Lisanti,* NYLJ, Nov. 29, 1979, at 14, col 4 [reducing widower's larger share to 50%]; *Matter of Palazzo,* NYLJ, Sept. 4, 1984, at 14, col 6 [reducing widower's share from 71% to 60%]; *Estate of Philippou,* NYLJ, Feb. 1, 1985, at 15, col 2 [raising the infant's share from 15.3% to 50%]; *Matter of Slater,* 108 Misc 2d 555, *affd* 79 AD2d 1091 [a larger share to children (as against their stepmother distributee) who were living with their nondistributee mother, from whom the decedent was divorced]; *Estate of Feldman,* NYLJ, May 22, 1985, at 14, col 5 [adding 15.3% to the total of the children's share and then applying *Kaiser* among the children]; *Estate of Stanley,* NYLJ, June 11, 1985, at 12, col 1 [where the surviving spouse's dependency was minimal compared to the lifetime needs of the disabled child]; *Matter of Duffy,* NYLJ, June 16, 1992, at 39, col 6 [court declined to apply *Kaiser,* considering that nine children survived, aged 19 to 30, but that one child would have received 95.5% of the award]; *see also, Estate of Genovese,* NYLJ, Oct. 17, 1978, at 13, col 5; *Estate of Rosa,* NYLJ, Dec. 24, 1984, at 13, col 6; *Estate of Scott,* NYLJ, May 15, 1985, at 15, col 6).

In *Estate of Jiminez* (NYLJ, Apr. 9, 1980, at 11, col 4), the Surrogate allocated the proceeds equally between the infant and the widower, rejecting a proposed *Kaiser* application that would have given 68.18% to the surviving spouse who was 26 years old at the time of decedent's death as against 31.82% to the infant who was then one week old *(see also, Estate of Mitchell,* NYLJ, Feb. 4, 1982, at 13, col 4, awarding the child an increased share, and ordering that the child be named beneficiary of an irrevocable $100,000 policy on the widower's

life; *accord Estate of Erbaio,* NYLJ, Nov. 19, 1987, at 14, col 4 *[Kaiser* distribution rejected in favor of an almost even distribution among the widow and the two children]; *see generally,* 5B Warren's Heaton, Surrogate's Courts § 478-C [6th ed]; 7B Warren, Negligence in the New York Courts, Death Actions, § 6.03 [2] [4th ed]; 37 NY Jur 2d, Death, § 384 *et seq.;* 21 Carmody-Wait 2d, NY Prac § 130:97 *et seq.).*[4]

If *Kaiser (supra)* has the advantages of ease, simplicity, and predictability, the departure cases reflect the benefits of flexibility and enhanced individualization, the very commodities that the Legislature sought in enacting the 1949 legislation that opened the door to *Kaiser.* It is, of course, for State Legislatures to determine whether the distribution should be in accordance with proportionality or with the laws of intestacy or otherwise, and in this the States have varied *(see,* Annotations, *Division among beneficiaries of amount awarded by jury or received in settlement upon account of wrongful death,* 171 ALR 204, 112 ALR 30, 14 ALR 516). Having chosen proportionality, New York's debate has centered around the means to reach the desired result. More recent critical analysis has included forceful advocacy in favor of a greater flexibility and discretion than a mechanical *Kaiser* format affords *(see,* Midonick, *Wrongful Death Distributions in the Surrogate's Court: What's the Matter with Matter of Kaiser?,* 58 NY St B J, No. 3, at 7 [Apr. 1986]; *see also, Matter of Feld,* 153 Misc 2d 615, 619-620, in which the court faulted the *Kaiser* formulation for its assumption that each distributee, each year, deserves an equal amount in terms of dependency, notwithstanding that the pecuniary losses and their conceptual foundations vary depending on one's status as a child, compared to a surviving spouse).

Despite its faults and frailties, however, *Kaiser (supra)* has not fallen out of use *(e.g., Matter of Ramos,* 143 Misc 2d 153; *Matter of Muccini,* 118 Misc 2d 38; *see also, Stoddard v Ling-Temco-Vought, Inc.,* 513 F Supp 339 [applying *Kaiser*-type formula]; *Horsford v Estate of Horsford,* 561 P2d 722 [Alaska] [applying *Kaiser*-type formula]), and is often at least the starting point for allocative adjudications, so many of which are resolved upon consent.

---

4. Moreover, some courts have altered the life expectancy figure when the prospective distributee's physical condition suggests a shorter life span than the mortality tables *(e.g., Estate of Heller,* NYLJ, Mar. 28, 1977, at 15, col 1 [heart condition]; *see also, Woodard v Pancio,* 65 AD2d 923 [cancer]).

In the case before us, the deceased, a 22-year-old laborer, met his death on August 12, 1978, overcome by chemical fumes, while cleaning a degreasing pit. At the time of his death, his wife (the appellant widow/administratrix in the appeal before us) was 19 years old and pregnant. One of their children was just over two years old, and the second child was born on February 26, 1979, several months after decedent's death.

After acquiring limited letters of administration, the widow brought an action in Supreme Court, Suffolk County, resulting in a plaintiff's verdict against several defendants with varying degrees of blame for wrongful death. On December 14, 1988, a judgment was entered in the sum of $1,596,548, which, with interest, totalled $2,958,269.87. Of this, $1,000,000 has been paid over for distribution, and is the subject of this appeal. The balance of the judgment is the subject of an appeal from the verdict, and is secured by bond.

The guardian ad litem filed a report with the Surrogate, asking that distribution be made in three equal shares, to the widow and the two children, rather than under the *Kaiser* formula, and he requested a hearing based on his objection to the widow's petition for a *Kaiser* distribution.

At the hearing, the widow testified as to her relationship with the deceased, and discussed his employment, and her own contributions toward the family income. Their joint earnings were in the neighborhood of $250 per week. She had been married to the deceased from March 26, 1976 until his death on August 12, 1978. She also stated, on direct examination, that she remarried in 1982, and now has three children with her second husband. This marriage, she said, is unstable and she is contemplating divorce. On cross-examination, and without objection, she stated that her husband has expressed no interest in adopting the two distributee children of her former marriage. She also detailed the uncertainties as to her future employment, and the prospect of her having to care for the three children of her second marriage.

The guardian ad litem stressed that a number of factors argued for an equal distribution in thirds among the widow and two children. He pointed out that the award was large, and that the marriage between the decedent and the widow was of relatively short duration. He noted that the children's stepfather expressed no wish to adopt them (a factor considered by the Surrogate in *Estate of Erbaio* [NYLJ, Nov. 19,

1987, at 14, col 4, *supra]),* and that they are thereby subject to the vagaries of support in a new family unit that includes their three stepsiblings. He also asserted that the assignment of a considerably longer period of "dependency" to the widow leads to a disproportionately larger share for her at the expense of the decedent's children.

After the hearing, the Surrogate rendered an opinion in which he found that the two children of the deceased are in good health, both in mind and body, and that their mother (who, from all indications, is no doubt devoted and capable) has had a difficult time financially, and has suffered a pecuniary loss owing to the death of her first husband, but that translated into pecuniary terms as best one can, the children have suffered no less, being deprived of the nurture and care of their father during their formative years, and thereafter.

The Surrogate, after examining the entire picture, concluded that equity is best served by allocating equal shares among the three distributees, stressing that the children's loss was compounded by the instability of the new family unit, and their uncertain future.

In challenging the Surrogate's determination, the widow argues that he erred in considering her remarriage. We disagree. It is true that in a wrongful death action trial courts have not normally allowed defendants to introduce evidence of the prospective distributee's remarriage *(see, Woodard v Pancio,* 65 AD2d 923, 924, *supra).* The rule, however, is designed to prevent the mitigation of damages payable by a defendant or defendants, so as to foreclose any defense argument that the total award should be lessened now that the surviving spouse, by virtue of remarriage, is no longer "deprived" *(see generally,* Annotation, *Admissibility Of Evidence Of, Or Propriety Of Comment As To, Plaintiff Spouse's Remarriage, Or Possibility Thereof, In Action For Damages For Death Of Other Spouse,* 88 ALR3d 926). Accordingly, this Court, in *Lawler v Nucastle Motors Leasing* (35 AD2d 450, 452), stated that " 'the remarriage of a widow after the death of her husband is not taken into consideration in computing the damages recoverable for the wrongful death of the husband' " (quoting *Rodak v Fury,* 31 AD2d 816, 817; *see also, Riley v Capital Airlines,* 42 Misc 2d 194, 205-206).

Some courts, in allocating a wrongful death recovery, disregarded the surviving spouse's remarriage on the ground that its effect is speculative, not pertinent, or a disincentive to

remarry *(see, Matter of Schweckendieck,* 56 Misc 2d 809; *Matter of Giambertone,* 38 Misc 2d 784; *see, Estate of Jiminez,* NYLJ, Apr. 9, 1980, at 11, col 4, *supra; Matter of Saxe,* 21 Misc 2d 811, 813; *Matter of Signs,* 52 Misc 2d 634, 635-636).

Although the rationale for disregarding evidence of remarriage may often be appropriate, such an exclusion is far more compelling in the assessment of damages phase than in the allocation phase *(see, e.g., Estate of Erbaio,* NYLJ, Nov. 19, 1987, at 14, col 4, *supra,* where it was taken into account), and we think it unwise to lay down any rigid doctrine by which the Surrogate must, under all circumstances, shut his or her eyes to considerations that in some cases may weigh in equity. It was not improvident of the Surrogate to consider it here, if for no other reason than that it was offered by the widow herself. The Surrogate did not, however, use the fact of remarriage as a reason to reduce her share, or to hold that she is entitled to less because her needs are being fulfilled by her second husband. On the contrary, he considered the remarriage insofar as it has created, under the facts of this case, a condition that has put the children into an arena of uncertainty concerning their future and their economic plight in the context of a new, unsettled family unit. Under these circumstances, we find no error in the court's consideration and analysis of the interfamilial conditions, as revealed at a hearing, the very purpose of which was to make equitable determinations. If *Kaiser (supra)* were to be applied automatically in all cases, the statutory provision for a hearing would take on a shallow meaning.

As EPTL 5-4.3 and 5-4.4 contemplate, the Surrogate measured the pecuniary losses of the parties, taking into account the reasonable expectations of future support from the deceased *(see, Loetsch v New York City Omnibus Corp.,* 291 NY 308, 310) and the circumstances and financial conditions of the respective distributees *(see, Gonzalez v New York City Hous. Auth.,* 77 NY2d 663, 668; *Matter of Mairowitz,* 90 Misc 2d 854, 857). It is well established that the compensable losses do not include sorrow or mental anguish *(see, Smith v Lehigh Val. R. R. Co.,* 177 NY 379), or loss of companionship *(see, Gilbert v Stanton Brewery,* 295 NY 270), but he stressed the children's loss of their father's nurturing and instruction, considerations that have been expressed since even the earliest decisions *(see, Tilley v Hudson Riv. R. R. Co.,* 24 NY 471; *McIntyre v New York Cent. R. R. Co.,* 37 NY 287; *see also, Kenavan v City of New York,* 120 AD2d 24, 33, *affd* 70 NY2d

558). The widow has cited *Matter of Frank* (286 App Div 986), in support of her claim for a *"Kaiser"* share. In *Frank,* the Surrogate applied a strict arithmetic distribution according to life expectancy, so that the widow received only 18% and her sons 82% of the recovery. The Appellate Division, Fourth Department, reversed the order, ruling that the record did not justify so disparate a distribution. *Frank* does not support a *"Kaiser"* distribution in the case before us, and argues more for flexibility than for unbending actuarial measurement in determining the surviving spouse's loss.

In sum, we find no error in the court's equal allocation. The ends of equity are not always best served by arithmetic yardsticks. Experience has shown that there may be variations and factors calling for equitable adjustments to relax an otherwise inelastic application of *Kaiser (supra)*. Its "years of dependency" formula is not brittle, but malleable, and not beyond the exercise of the court's sound discretion. No doubt the *Kaiser* allocation may be employed often, with no resulting imbalance. The history of the process reveals as much. Nevertheless, there are other instances, as in the case before us and the numerous cases that we have cited, in which departure from *Kaiser* is within the boundaries of an informed discretion. We therefore affirm the decree insofar as appealed from, without costs or disbursements.

MANGANO, P. J., RITTER and SANTUCCI, JJ., concur.

Ordered that the decree is affirmed insofar as appealed from, without costs or disbursements.