In the Matter of the Application of Leah ADLER, as Executrix of the Estate of Mordechai Adler, and Leah Adler, Individually.

No. CV 93–1476 (MDG).

United States District Court,
E.D. New York.

Dec. 3, 1994.

Tamara S. Heckman, Trial Atty., Tax Div., U.S. Dept. of Justice, Washington, DC, Thomas A. McFarland, Asst. U.S. Atty., E.D.N.Y., Brooklyn, NY, for U.S.

Mordechai Schwartz, Fuchsberg & Fuchsberg, New York City, for Leah Adler, individually and as executrix.

John M. Leventhal, Brooklyn, NY, guardian ad litem, for Mordechai, Mendel and Rachel.

Moshe Katlowitz, New York City, for Meyer and Israel Adler.

Stanley Lane, Jr., Otterbourg, Steindler, Houston & Rosen, P.C., New York City, for BNY Financial Corp.

Robert J. Clerkin, Hahn & Hessen, New York City, for Burlington Industries, Inc.

Paul Forster, New York City, for N.Y. Dept. of Taxation and Finance.

### MEMORANDUM DECISION AND ORDER

GO, United States Magistrate Judge.

This proceeding regarding settlement of a personal injury action brought on behalf of decedent Mordechai Adler ("Adler") was removed by the United States from the Surrogate's Court, Kings County. The parties have consented pursuant to 28 U.S.C. § 636(c) to having me decide pending motions regarding the distribution of the settlement proceeds. The motions concern the

interplay between state law and federal tax laws in determining the effect of tax liens, the validity of disclaimers and the priority of creditors and distributees of wrongful death proceeds.

## BACKGROUND

The facts of this case are not in dispute. The parties stipulated at oral argument to the facts set forth in the documentary evidence submitted.

### Wrongful Death Action

On August 15, 1989, at around 8:20 p.m., Adler and his son were walking along a road in Orange County, New York when Adler was struck by a speeding car owned by James McArdle ("McArdle") and driven by his son, James McArdle, Jr. Adler was carried on the hood of the vehicle approximately seventy feet before falling into a ditch on the side of the roadway. Goldie Deutsch arrived at the scene of the accident almost immediately thereafter, and was later joined by her husband, Yehuda Deutsch. Both stated in affidavits dated September 13, 1993 that they found Adler to be unconscious and unresponsive.

In a police accident report signed by Trooper K.M. Corlett, Adler's physical and emotional status was listed as "apparent death." At 8:53 p.m. Adler was brought to the emergency room of the Arden Hill Hospital in Goshen, New York. He was not breathing and had no pulse or respiration, despite administration of cardiac pulmonary resuscitation in the ambulance. After efforts to revive him failed, he was declared dead at 9:11 p.m. The cause of his death noted in emergency room records was cardio-respiratory arrest secondary to trauma. The death certificate lists the cause of death as "Fractured skull, Pelvis, and Left Distal Tibia & Fibula." The medical and police accident reports indicate that Adler had sustained injuries over his entire body.

On December 14, 1990, the Surrogate's Court, Kings County issued letters testamentary to Adler's wife, Leah Adler, as executrix of the estate of Mordechai Adler (the "Estate"). On December 20, 1990, Leah Adler, as executrix of the Estate and individually, brought an action in Supreme Court, Kings County against James McArdle seeking $10,000,000 for wrongful death, $5,000,000 for pain and suffering, and $5,000,000 in punitive damages. In late 1992, Mrs. Adler and the insurance company representing Mr. McArdle agreed to settle the action for $350,000, the limit of McArdle's policy.

In January, 1993, Mrs. Adler brought a proceeding in the Kings County Supreme Court for leave to settle and compromise the wrongful death action against James McArdle, to discontinue the action for pain and suffering, to distribute the proceeds and to settle the account for the Estate. The matter was then referred to the Surrogate's Court and citations issued. The United States removed the action to this court on April 2, 1993.

A hearing was held before me on June 25, 1993 regarding Mrs. Adler's application to approve the settlement with McArdle. In her supporting affidavit originally submitted to the Surrogate's Court, Mrs. Adler stated that her counsel had determined after investigation that McArdle had no assets besides the insurance policy to satisfy a judgment. Moreover, all the parties at the hearing noted their consent to the settlement. By order dated July 8, 1993, I ruled that the settlement of the tort action for $350,000 by Lumberman's Mutual Casualty Company on behalf of McArdle would be approved, absent any written objections. No objections were filed. Mrs. Adler then executed releases, as executrix and individually, releasing McArdle from liability with respect to all matters relating to the tort action. The settlement proceeds are being held in escrow pending resolution of the remaining dispute over distribution of the proceeds.

### Creditors and Distributees

Various creditors of the Estate and Mrs. Adler, as well as Adler's distributees, have asserted claims against the settlement proceeds as follows.

*Federal Tax Liens.* On December 15, 1983, a delegate of the Secretary of the Treasury assessed Mordechai and Leah Adler, jointly and severally, for outstanding taxes for the taxable year 1976, in the amounts of

$43,241.00 in tax and $35,491.78 in interest. The United States subsequently filed notices of federal tax liens against Mordechai and Leah Adler on or about September 12, 1985, December 16, 1986, March 25, 1988, October 30, 1989, December 11, 1989 and October 12, 1990. The United States claims that the total amount of taxes owed by the Estate and Mrs. Adler, jointly and severally, is $164,633.57. This sum consists of $55,823.38 in outstanding principal liability before accruals, $98,938.69 in interest accrued to April 27, 1992, and $9,871.50 for the penalty accrued to April 27, 1992. On March 21, 1989, Mordechai and Leah Adler executed a waiver which extended the period for collection of the 1976 tax assessments until 1999.

*Judgment Creditors.* On March 5, 1991, Burlington Industries, Inc. ("Burlington") obtained a judgment for $367,478.81 against Leah Adler individually and as the executrix of the Estate from the Supreme Court, New York County. BNY Financial Corporation ("BNY") also obtained a judgment for $2,280,000.00 against Leah Adler individually and as the executrix of the Estate from the Supreme Court, New York County on March 4, 1992.

*New York State Tax Claims.* The Commissioner of the New York State Department of Taxation and Finance ("Commissioner") asserted a claim for $20,666.15, plus interest from May 16, 1993, against Mordechai and Leah Adler and Highworth Trading Co. Ltd., their closely held company, for tax assessments for various sales, and corporate and withholding taxes for the years 1989, 1990 and 1991. The Commissioner had previously filed an objection in the Surrogate's Court to settlement of the Estate until a determination is made of the taxes due from the Estate and proof of filing and payment of all outstanding income and fiduciary income tax returns by the decedent and his Estate.

*Distributees.* At the time of his death, Mordechai Adler was survived by his wife, Leah Adler, who was 38, and their five children: Mordechai Adler (not yet born), Mendel Adler (age 9), Rachel Adler (age 11), Meyer Adler (age 15), and Israel Adler (age 17½). On August 18, 1992, Mrs. Adler filed a notice of renunciation, seeking to renounce her interest in any monies attributable to her share of wrongful death proceeds.

Mrs. Adler and her children (the "Adler claimants") now subsist on welfare. Since they are observant Orthodox Jews, the children attend religious schools.

Mrs. Adler, the guardian *ad litem* for her three infant children, and Israel and Meyer Adler, her children who are no longer infants, have moved for an order determining: (1) that the settlement proceeds be allocated entirely to wrongful death rather than pain and suffering; and (2) that Mrs. Adler's renunciation was valid against the federal tax lien and judgment creditors or, in the alternative, for an order awarding the entire wrongful death proceeds solely to the children.

## DISCUSSION

### I. Allocation of the Settlement Proceeds between Pain and Suffering and Wrongful Death

 Damages awarded for a decedent's pain and suffering become the property of the decedent's estate. N.Y. Est. Powers & Trusts Law ("E.P.T.L."), § 11–3.3(a) (McKinney 1993). However, damages for wrongful death belong to the decedent's statutory distributees. E.P.T.L. §§ 5–4.1, 5–4.4 (McKinney Supp.1994); *George v. Mt. Sinai Hosp.,* 47 N.Y.2d 170, 176, 417 N.Y.S.2d 231, 235, 390 N.E.2d 1156, 1159–60 (1979); *Dawson v. Langner,* 106 A.D.2d 152, 153, 484 N.Y.S.2d 743, 744 (4th Dep't 1985). Since pain and suffering damages are property of an estate, they are subject to federal tax liens. *United States v. McDermott,* —— U.S. ——, 113 S.Ct. 1526, 123 L.Ed.2d 128 (1993). On the other hand, wrongful death proceeds are considered a property right of the distributees. *Alberino v. Long Island Jewish–Hillside Medical Center,* 87 A.D.2d 217, 218, 450 N.Y.S.2d 857, 859 (2d Dep't 1982). The creditors in this action may properly assert claims against the wrongful death proceeds only to the extent that they have a valid claim against any potential distributee of Adler—i.e., Mrs. Adler.

The Adler claimants contend that the entire amount of the settlement should be at-

tributed to the wrongful death claim while the United States argues that at least a portion of the proceeds should be attributable to pain and suffering. An initial determination must be made whether the settlement proceeds should be allocated between the claims for pain and suffering and wrongful death, since these claims give rise to distinct property interests with differing consequences for creditors.

■ Under New York law, "cognitive awareness is a prerequisite to recovery" for pain and suffering on behalf of a decedent. *McDougald v. Garber,* 73 N.Y.2d 246, 255, 538 N.Y.S.2d 937, 940, 536 N.E.2d 372, 375 (1989). The party asserting a claim for pain and suffering ordinarily has the burden of demonstrating that the injured person consciously experienced pain after the injury. *Cummins v. County of Onondaga,* 198 A.D.2d 875, 876, 605 N.Y.S.2d 694, 695 (4th Dep't 1993). As the court in *Cummins* explained: "[w]hile circumstantial evidence of consciousness can suffice ... there still must be some direct evidence of consciousness." *Id.* New York courts have routinely rejected claims for pain and suffering where there is no evidence that the decedent was conscious from the time of an accident until her death. *See, e.g., Williams v. City of New York,* 169 A.D.2d 713, 564 N.Y.S.2d 464 (2d Dep't 1991); *Huertas v. State,* 84 A.D.2d 650, 444 N.Y.S.2d 307 (3d Dep't 1981).

■ In this case, there is no evidence to support the Government's assertion that Adler was conscious at any time between the accident and his death. The police and medical reports and the sworn testimony of Goldie and Yehuda Deutsch all indicate that Adler sustained massive injuries from the accident and was unconscious when observed almost immediately after the accident. The medical records also indicate that by the time Adler was brought to the hospital emergency room half an hour after the accident, he had no cardiac or respiratory function. None of these reports gives any indication that Adler ever regained consciousness before being declared dead shortly after arrival at the hospital. The facts of this case are similar to those in *Delosovic v. City of New York,* 143 Misc.2d 801, 812, 541 N.Y.S.2d 685, 693

(1989), *aff'd, without op.,* 174 A.D.2d 407, 572 N.Y.S.2d 857 (1st Dep't 1991), where the court rejected a claim that the decedent was conscious "in the flash between contact" when struck by a truck and "loss of consciousness through crushing by the wheels." Here, as in *Delosovic,* the inference of cognitive awareness is simply too speculative.

The United States points to the fact that Mrs. Adler originally sought substantial damages for pain and suffering as support for its conjecture that Adler might have been conscious for a period of time immediately after impact. The assertion of a claim for pain and suffering is hardly evidence of consciousness since plaintiffs in wrongful death cases routinely seek damages for pain and suffering in the alternative. Moreover, since the allegations in the complaint against McArdle were made on information and belief, the unverified assertion of a claim for pain and suffering should not bind Mrs. Adler from now contending otherwise.

I note that it is not unfair to require the United States to come forward with direct evidence of consciousness to support its proposed allocution of the settlement proceeds. The burden of production, as well as the burden of persuasion, as to claims for pain and suffering is ordinarily imposed on the plaintiff since it is almost always the party asserting such a claim. Direct and indirect evidence of consciousness may be obtained from available witnesses who frequently are not parties (as in this case), from physical evidence and from expert testimony. If it exists, such evidence is as available to the United States, as the party now claiming pain and suffering on the part of the decedent, as it would have been to Mrs. Adler.

Although not framed as such by New York State courts, the requirement of conscious awareness as an element of any claim for pain and suffering essentially operates as a rebuttal presumption. Once the fact of death is established, the presumption arises that the decedent suffered no pain and suffering which can be rebutted by evidence of consciousness. *See* Jack B. Weinstein et ano, *Weinstein's Evidence* ¶¶ 300[03] and 301[02] (1993). Fed.R.Evid. 301 directs that "a presumption imposes on the party against whom

it is directed the burden of going forward with evidence to rebut or meet the presumption ..." By electing to rest on the documentary record, the United States failed to meet its burden of going forward with evidence of consciousness to rebut the applicable presumption. *Compare Jamaica v. Narvaez*, 198 A.D.2d 476, 604 N.Y.S.2d 209 (2d Dep't 1993) (expert testimony of consciousness for 20 minutes after car collision sufficient to establish conscious pain and suffering).

Based on the record before me, I conclude that Mordechai Adler did not regain consciousness after the accident. Therefore, I allocate all of the settlement proceeds to wrongful death and none to pain and suffering.

## II. *Effect of Mrs. Adler's Renunciation of Her Interest in the Wrongful Death Claim*

The Adler claimants assert that because Mrs. Adler made a valid renunciation of her interest in the wrongful death claim, the liens against her and the Estate filed by the Internal Revenue Service, as well as the judgments and liens of other creditors, cannot attach to the wrongful death proceeds. They further contend that the entire settlement should be distributed to her children.

■ According to E.P.T.L., § 2–1.11(b) (McKinney 1981), "any beneficiary of a disposition may renounce all or part of his interest ... within nine months of the date of the disposition." When properly filed, a renunciation is considered "retroactive to the creation of the disposition" so that it "has the same effect with respect to the renounced interest as though the renouncing person had predeceased the creator or the decedent...." E.P.T.L., § 2–1.11(d) (McKinney Supp.1994). A validly filed renunciation thus has the effect of wiping out the disposition as if it never existed.

At issue is whether Mrs. Adler's renunciation negates attachment of the federal tax liens upon her share of the wrongful death proceeds. Title 26 U.S.C. § 6321 provides:

If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person.

■ Under section 6321, federal tax liens "reach every interest in property that a taxpayer might have," *United States v. National Bank of Commerce*, 472 U.S. 713, 720, 105 S.Ct. 2919, 2924, 86 L.Ed.2d 565 (1985), including current and after-acquired property. *Glass City Bank v. United States*, 326 U.S. 265, 267, 66 S.Ct. 108, 110, 90 L.Ed. 56 (1945). This section neither creates nor defines property rights, but attaches federally defined consequences to rights created under state law. *United States v. Bess*, 357 U.S. 51, 78 S.Ct. 1054, 2 L.Ed.2d 1135 (1958). Thus, the determination of a property interest for purposes of a federal tax lien is governed by state law.

■ In *United States v. Comparato*, 22 F.3d 455, 457 (2d Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 481, 130 L.Ed.2d 394 (1994) the Second Circuit rejected the argument that a renunciation made pursuant to state law eradicated a property interest encumbered by a federal tax lien. The Court affirmed a decision of Judge Reena Raggi holding that a married couple's renunciation of the proceeds of a malpractice action brought in the name of their deceased son was ineffective against federal tax liens. As Judge Raggi reasoned: "For purposes of enforcing a federal tax lien, state law is relevant only to the determination of whether a taxpayer has a right to certain property, not to whether he can thereafter renounce his right." *United States v. Comparato*, 850 F.Supp. 153, 159 (E.D.N.Y.1993), quoting *United States v. Rodgers*, 461 U.S. 677, 683, 103 S.Ct. 2132, 2137, 76 L.Ed.2d 236 (1983) ("once it has been determined that state law has created property interests sufficient for federal tax lien[s] to attach, state law 'is inoperative to prevent the attachment' of such liens"). The Second Circuit noted that "federal law controlled whether [the taxpayers'] interests were exempt from levy by the

United States." *Id.,* 22 F.3d at 458, *citing United States v. Rodgers,* 461 U.S. 677, 683, 103 S.Ct. 2132, 2137, 76 L.Ed.2d 236 (1983). Because the Second Circuit holding in *Comparato* governs this case, Mrs. Adler's renunciation is invalid as against the federal tax lien. *But see, Mapes v. United States,* 15 F.3d 138 (9th Cir.1994) (holding that a renunciation pursuant to Arizona's Probate Code does determine whether a person has any interest in property for federal tax purposes). Consequently, any settlement proceeds to which she is entitled absent the renunciation are subject to the lien.

■■■ The reasoning of the Supreme Court in *United States v. Irvine,* ——— U.S. ———, 114 S.Ct. 1473, 128 L.Ed.2d 168 (1994) lends further support for the result reached in *Comparato.* In *Irvine,* Sally Irvine filed a disclaimer of an interest in a family trust in August, 1979, on the eve of the distribution of the trust. The disclaimer was effective under Minnesota law, but not under Treas.Reg. § 25.2511–1(c)(2). The Supreme Court reaffirmed the principle followed in *Comparato* that "although state law creates legal interests and rights in property, federal law determines whether and to what extent those interests will be taxed." *Id.* at ———, 114 S.Ct. at 1481. The Court then applied federal law in determining the validity of Irvine's disclaimer for federal gift tax purposes.

Even if *Comparato* did not spell doom for their argument, the Adler claimants' position still fails for the additional reason that Mrs. Adler failed to make a timely renunciation when she renounced her interest two years after Adler's death. Mrs. Adler admittedly failed to comply with the requirement of Section 2–1.11(a) of the E.P.T.L. that a renunciation in the proceeds of a wrongful death action be made within nine months of the date of the decedent's death.

The Adler claimants urge the court to extend the time for filing the renunciation pursuant to subsection (b)(2) of that provision. However, as *Irvine* makes clear, the determination of the validity of Mrs. Adler's disclaimer is governed by federal law, which, in this case, is set forth in 26 U.S.C. § 2518(b). On the facts here, Section 2518(b)(2) requires that a person making a

disclaimer must do so "not later than the date which is 9 months after ... the day on which the transfer creating the interest in such person is made." Unlike the E.P.T.L., federal law leaves no discretion for a court to extend the time for making a disclaimer.

As the Supreme Court in *Irvine* recognized, "state property transfer rules do not translate into federal taxation rules." *Irvine,* ——— U.S. at ———, 114 S.Ct. at 1481. Unlike federal revenue laws which are designed to provide a nationwide scheme of taxation and to curb tax avoidance, "state-law tolerance for delay in disclaiming reflects a less theoretical concern" in barring creditors from reaching the disclaimed property. *Id.* at ——— – ———, 114 S.Ct. at 1481–82. The Court thus emphatically rejected state law in favor of the Treasury regulation governing gift tax disclaimers:

> Congress had not meant to incorporate state law fictions as touchstones of taxability with it enacted the Act. Absent such a legal fiction, the federal gift tax is not struck blind by a disclaimer.

*Id.* at ———, 114 S.Ct. at 1482. Because the reasoning in *Irvine* is equally applicable to the federal disclaimer statute at issue in this case, Leah Adler's renunciation is invalid under federal law for federal tax purposes.

■■■ The Adler claimants further argue that because Leah Adler's wrongful death claim is an inchoate property interest, the federal tax lien is also inchoate and did not attach to the proceeds prior to renunciation. This argument is based on the incorrect assumption that a wrongful death claim is inchoate, which is contrary to established New York law that a wrongful death recovery "accrues to the distributees and *vests in them at decedent's death." Alberino v. Long Island Jewish–Hillside Medical Center,* 87 A.D.2d at 218, 450 N.Y.S.2d at 859 (emphasis added).

The Adler claimants also improperly rely on *Don King Productions, Inc. v. Thomas,* 945 F.2d 529 (2d Cir.1991). In that case, the Second Circuit defined a choate lien as "one in which the identity of the lienor, the property subject to the lien and the amount of the lien are established." *Id.* at 533. The feder-

al tax liens here clearly meet these criteria; they were assessed for a definite amount and became choate well before the decedent's death. The fact that a wrongful death claim is initially of indeterminate value has no bearing on the choateness of either the property interest of each distributee in the claim or the federal tax liens.

Thus, all of the arguments offered by the Adler claimants fail to defeat the attachment of the federal tax liens against Mrs. Adler's original interest in the wrongful death claim. Moreover, the federal tax liens clearly have priority over the claims of other creditors. *Don King Productions,* 945 F.2d at 533. Since, as discussed below, the federal tax liens exceed all of Mrs. Adler's share of the proceeds, I will not reach the issue of the validity of Leah Adler's renunciation under New York law as to the other creditors.

### III. *Allocation of Wrongful Death Proceeds*

 Since Mrs. Adler's renunciation is ineffective against the tax liens, the wrongful death proceeds must be allocated among her and her five children. In making this allocation, this court [1] must determine Mrs. Adler's equitable share of the proceeds without regard to the existence of the federal tax liens, given my ruling above as to the nature of those liens.

Section 5–4.4(a)(1) of the E.P.T.L. (McKinney's 1981) specifies that wrongful death proceeds must be distributed to the decedent's distributees "in proportion to the pecuniary injuries suffered by them ..." The court in *In re Kaiser's Estate,* 198 Misc. 582, 100 N.Y.S.2d 218 (Sur.Ct.Kings Co.1950) devised a formula which, until recently, has been widely used in allocating wrongful death benefits to a decedent's spouse and children. This formula is based on the assumption that the pecuniary loss suffered by each distributee is proportionate to the number of years he or she can expect to receive support from the decedent. Under *Kaiser,* the surviving spouse is expected to receive support for the shorter of the life expectancies of the decedent or the surviving spouse and each child is expected to receive support for the number of years between the date of death and the child's twenty-first birthday. The percentage to be allocated to each distributee is calculated by means of fractions in which the sum of the years of support for all six distributees is the denominator and the number of years of support for each individual is the numerator. Immediately prior to the accident, Mordechei Adler, who was the same age as his wife, had the shorter life expectancy of 37 years, and 37 is thus the numerator for Mrs. Adler's share.

Applying the *Kaiser* formula to the net settlement proceeds of $278,634.47, after deducting attorneys' fees and costs in the wrongful death action but not the guardian *ad litem*'s fees, the amount that Mrs. Adler and each child would receive as a distributee of the wrongful death proceeds is as follows:

### Application of Kaiser Formula

| Name | Date of Birth | % Share | Estimated Distribution |
|---|---|---|---|
| Mordechai Adler | 10/6/89 | $21_{88}$ or 23.9% | $ 66,593.64 |
| Mendel Adler | 6/18/80 | $12_{88}$ or 13.6% | $ 37,894.29 |
| Rachel Adler | 4/18/78 | $9.5_{88}$ or 10.8% | $ 30,092.52 |
| Meyer Adler | 11/11/73 | $5_{88}$ or 5.7% | $ 22,755.15 |
| Israel Adler | 2/14/72 | $3.5_{88}$ or 4.0% | $ 11,145.38 |
| Leah Adler | 6/15/51 | $37_{88}$ or 42.0% | $117,026.47 |
| Total | | $88_{88}$ 100% | $278,634.47 |

---

1. The allocation of wrongful death proceeds is not ordinarily a task undertaken by federal courts. However, all the parties confirmed on the record at oral argument that their consent included allocation of the proceeds. This is appropriate since the issue of distribution clearly affects the federal tax liens at issue.

Several courts and commentators have recently criticized the *Kaiser* formula as inequitable and illogical. In *Matter of the Estate of Feld*, 153 Misc.2d 615, 582 N.Y.S.2d 922 (Sur.Ct.N.Y.Co.1992), Surrogate Eve Preminger explained:

> Even the most superficial analysis demonstrates that computing a spouse's and a child's annual loss is not likely to produce amounts that are identical. Because *Kaiser* makes this invalid assumption, it will not yield a correct result in a statistically or equitably acceptable number of instances. It is thus of no aid to this court in allocating the proceeds among a surviving spouse and children. Accordingly, the *Kaiser* formula will not be applied in future cases.

> Instead one must examine all the factors which influence the appropriate proportion among distributees. This will still include consideration of the duration of anticipated support, but not to the exclusion of other factors. Decedent's income, habits, and prior relationship to the distributees, their needs, circumstances and histories of receiving benefits and all other evidence showing a disposition on the part of a decedent to provide assistance to a distributee ... will be evaluated.

*See also Matter of Acquafredda*, 189 A.D.2d 504, 596 N.Y.S.2d 839 (2d Dep't 1993) ("[e]xperience has shown that there may be variations and factors calling for equitable adjustments to relax an otherwise inelastic application of *Kaiser*"); Irwin M. Berg, *A New Formula to Replace Kaiser*, Trial Law. Q., Vol. 24/1 & 2 at 40 (1994); Joseph Kelner et ano, *'Kaiser' Revisited, Allocation of Wrongful Death Proceeds*, NYLJ, Nov. 29, 1994, at 3.

New York courts have held that the judge in a wrongful death action is "vested with discretion and with equitable powers as to the proportional allocation of wrongful death proceeds" and may depart from the *Kaiser* formula where unfairness would result from its application. *In re Estate of Duffy*, —— A.D.2d ——, 617 N.Y.S.2d 588 (3d Dep't 1994); *Matter of Acquafredda*, 189 A.D.2d at 506, 596 N.Y.S.2d 839.

Courts departing from *Kaiser* often do so in order to provide greater shares to children, particularly to young children. For example, in *Acquafredda*, the court upheld a judgment awarding equal amounts to a mother and her two children. Had *Kaiser* been followed, 55.6% would have been allocated to the mother and 21.1% and 23.3% to the children. The mother in that case was nineteen at the time of her husband's death and had remarried. One child was two, and the other was not yet born. While the court did not consider the remarriage a reason to reduce her share of proceeds, it weighed that factor "as a condition that has put the children into an arena of uncertainty concerning their future and their economic plight in the context of a new, unsettled family unit." *Acquafredda*, 189 A.D.2d at 516, 596 N.Y.S.2d at 847.

Several factors in this case support a departure from the *Kaiser* formula. Because there are five children, each child would receive a significantly lesser share under the *Kaiser* formula than would be the case if there were fewer children. As a result, they each also have a disproportionately smaller share than their mother. Additionally, courts have given special consideration to children not yet born or still very young at the time of death of a parent because they have been deprived of "the nurture and care of their father during their formative years." *Acquafredda*, 189 A.D.2d at 515, 596 N.Y.S.2d at 846.

Furthermore, the Adler children attend private religious school and require support beyond subsistence for educational and religious needs, including books, supplies and tuition for elementary and secondary school. Because of the significant role that religion plays in their lives, public school is not an option for them. *See Rucks v. Nugent*, 191 A.D.2d 786, 594 N.Y.S.2d 379 (3d Dep't 1993) (religious background cited as a special circumstance that may warrant requirement that ex-husband contribute to private school tuition). New York courts have also increasingly recognized that parents have an obli-

gation to pay for college tuition. *Cohen v. Cohen,* 203 A.D.2d 411, 610 N.Y.S.2d 313 (2d Dep't 1994).

In addition, school age children have subsistence needs that adults do not have. Growing children have a greater need to replace their clothes and may require greater medical attention.

On the other hand, I recognize that Mrs. Adler also has suffered a substantial pecuniary loss. She is not presently employed and has not remarried. Clearly, her expected financial dependence lasts much longer than that of any of her children. However, in light of the fact that Adler was self-employed, it is unrealistic to assume that his support of his wife would remain at the same level in the later years of his life, particularly after he retired.

Weighing all the factors, I find that strict application of the *Kaiser* formula would be inequitable. The yearly needs of Mrs. Adler are not comparable to those of her children, who require special schooling and may need extra support for clothing and medical care. They also may have suffered more from the deprivation of the nurture and care of their father during their formative years, particularly in the case of the youngest child. Furthermore, application of the *Kaiser* formula would result in Mrs. Adler receiving 42% of the proceeds, a portion almost double that of her youngest child, six times that of her oldest, and over three times the amount of the average share per child.

However, the *Kaiser* formula provides at least a starting point in this case for analyzing the respective losses of Mrs. Adler and her children. An adjustment should be made to give each child a larger share, for the reasons discussed above. I therefore find that it is equitable and fair to increase the 58% collective share of the children by one-fourth—i.e. by 14.5% to be subtracted from Mrs. Adler's 42% share. Since the younger children have suffered the greater loss, they should receive a proportionately larger percentage of this increased share. Therefore, Mordechai's share should be increased by 4.5%, Mendel and Rachel's shares by 3% each, and Meyer and Israel's share by 2% each. This results in the following allocations:

Final Allocations

| Name | Original % Share | Final Adjusted % Share | Estimated Distribution |
|---|---|---|---|
| Mordechai Adler | 21/88 or 23.9% | 28.4% | $ 79,132.19 |
| Mendel Adler | 12/88 or 13.6% | 16.6% | $ 40,253.32 |
| Rachel Adler | 9.5/88 or 10.8% | 13.8% | $ 38,451.56 |
| Meyer Adler | 5/88 or 5.7% | 7.7% | $ 21,454.85 |
| Israel Adler | 3.5/88 or 4.0% | 6.0% | $ 16,718.07 |
| Leah Adler | 37/88 or 42.0% | 27.5% | $ 76,624.48 |
| Total | | | $278,634.47 |

The practical effect of this allocation will be to provide Mordechai, who is now only five years old and has never known his father, with approximately the same share as his mother. They will each have a share that is four times more than that of the oldest child, who was 17½ at the time of Adler's death, and approximately double that of the children who are now teenagers.

Since the actual amount available for distribution cannot be calculated until determination of the fees of John Leventhal, Esq.,

the guardian *ad litem,* he is directed to submit a fee application by December 29, 1994. Any objections to that application must be submitted by January 12, 1995. In addition, the firm of Fuchsberg & Fuchsberg is to submit an accounting by January 12, 1995 regarding the interest earned on the settlement proceeds held in escrow and taxes due thereon, if any.

## CONCLUSION

Upon determination of the guardian *ad litem*'s fees and interest earned, the settlement proceeds will be distributed in accordance with the foregoing allocations, with Mrs. Adler's share to be paid to the United States in partial satisfaction of the outstanding tax liens. This case will then be remanded back to the Surrogate's Court for settlement of the Estate.

SO ORDERED.