Hilco Property v. U.S.                    CV-93-390-JD  06/03/96 P
                UNITED STATES DISTRICT COURT FOR THE
                     DISTRICT OF NEW HAMPSHIRE


Hilco Property Services, Inc., et al.

     v.                                    Civil No. 93-390-JD

United States of America, et al.


                          O P I N I O N


     The plaintiff, New England Acceptance Corporation

("Hilco"), has brought the instant action under 28 U.S.C.A. §

2410(a)(1) (West 1978) against the United States ("the govern-

ment") and against Thomas S. Boyer and William R. Boyer, as

executors of the estate of their mother, Elizabeth H. Boyer,

seeking to quiet title to an approximately ninety-acre tract of

property located in Alton, New Hampshire.  Hilco holds a first

mortgage on the property.[1]  The government claims to hold a

federal tax lien that is superior to Hilco's security interest.

Thomas Boyer, William Boyer, and their sister, Paula Boyer

Scheibe, ("the children") have intervened as defendants in their

individual capacities.  The Pennsylvania firm of Prusky Law

_____

     [1]The mortgage, originally held by First NH - White Mountain
Bank, was acquired by First NH Bank following a merger with the
former entity.  In 1992, First NH assigned the mortgage to its
affiliate, Hilco Realty Corporation, which in late 1993 assigned
it to another affiliate, Hilco Property Services, Inc., which, in
turn, assigned it to the current plaintiff shortly before trial
in March, 1996.

Associates ("Prusky"), formerly tax counsel to the estate, has intervened as a plaintiff.

On April 29 and 30, and May 1 and 2, the court presided over the first of a two part bench trial to determine the controlling title questions of whether the property was conveyed by Elizabeth Boyer through an August 14, 1986, inter vivos gift of a warranty deed, as alleged by Hilco, or as a testamentary gift following her death on August 24, 1986, as alleged by the defendants. This initial opinion addresses the subsidiary questions of whether Elizabeth Boyer was competent when she purportedly executed the August 14, 1986, deed; whether the purported donee, a New Hampshire partnership consisting of certain members of the Boyer family known as Campfire Point Associates ("CPA"), was a legally cognizable entity capable of receiving title at the time the deed was executed; and, in light of the foregoing and other circumstances of the case, whether the August 14, 1986, conveyance operated to divest Elizabeth Boyer of the property prior to her death ten days later.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### Background

The instant action to quiet title had its genesis more than a decade ago as an unremarkable family dispute involving the

future of a family-run summer camp located on a fairly valuable piece of property abutting Lake Winnipesaukee.  However, beginning in 1986 the dissension quickly degenerated into a factual morass compounded by, inter alia, an ambitious plan to subdivide the property spearheaded by a son with no real estate experience and opposed by two siblings who lacked confidence in his vision; a deed executed by the camp matriarch while hospitalized with terminal cancer and while sedated by narcotic painkillers; a local bank once eager to finance the development and now eager to foreclose; a Philadelphia lawyer who counseled the family for decades and now faces a malpractice claim; a federal tax deficiency and an IRS lien of unknown priority; another lien filed by another lawyer facing a malpractice claim; and a brother-in-law that nobody liked.  Based on the documentary evidence, trial testimony, and the factual stipulations submitted by the parties, the court makes the following findings of fact.

I.   The Family Camp

Donald and Elizabeth Boyer worked at Camp Dewitt, an overnight camp for boys, since 1949 and, in 1962, purchased the camp along with at least one partner.  Donald Boyer died in 1982. The following year, Elizabeth Boyer purchased for $430,000 the fifty percent interest held by George Heebner, the remaining

3

partner in Camp Dewitt. Despite a personal fear of indebtedness, Elizabeth Boyer financed the Heebner buyout and, in early 1984, she became the sole owner of Camp Dewitt, Inc. Albert Ciardi, a Philadelphia attorney who had known and advised the elder Boyers for many years and who had settled Donald Boyer's estate, represented the family in the transaction.

Although each of the Boyer children was at some point involved with Camp Dewitt's operations, since 1980 only Tom maintained an active role. At various times he served as a counselor, assistant director and, following the death of his father, as co-director of the camp with his mother. On several occasions sister Paula accompanied Elizabeth during the road trip to New Hampshire prior to the start of camp in June and again at the close of the camp season in August. Paula's husband, Fred Scheibe, who worked for the camp for at least one summer during the 1970s, at times would join Paula for these visits. Eldest son William was uninterested in camp operations but periodically visited the property during the summer months with his wife for vacation and to see the family. William was unemployed for approximately nine months in 1985 and early 1986 and at some point sought full-time employment with Camp Dewitt. The request was denied, in part because William was unwilling to relocate to New Hampshire.

4

Based on the evidence, it is apparent that each of the Boyer children individually enjoyed a good relationship with their mother. However, the children did not get along with each other and some of the specifics of their acrimony are relevant to this lawsuit because they form the factual basis for the estate's current litigation position. Tom, who possessed an intensely emotional attachment to Camp Dewitt, resented William because William did not participate in camp activities but would frequent the property for leisurely vacations. Tom also had a "terrible" relationship with brother-in-law Fred, whom he considered to be difficult to get along with and "someone who knows more than anybody else about everything including operation of a summer camp." William disliked Fred for many of these same reasons and, as a result, both brothers were somewhat estranged from Paula, who tended to defer to Fred's judgment on family and other matters. Meanwhile, William, Paula, Fred, and Elizabeth each harbored serious doubts about Tom's ability to manage family matters other than those directly related to the operation of the camp. Finally, despite their differences, the children did not openly debate family matters because they did not want to upset Elizabeth and, in any event, did not spend much time in each other's company.

5

## II. Property Disposition Dilemma

Elizabeth was troubled by her children's differences but was reluctant to discuss this and other family matters. However, she did clearly communicate two concerns. First, she wanted Camp DeWitt to continue to operate after her death if possible. Second, she wanted to divide her property equally among her children. These intentions were well known to the children and the latter intention is also apparent from a will which purportedly devised her estate equally among her children. Although not mutually exclusive, the realization of these twin goals was problematic because the camp comprised the bulk of Elizabeth's estate and, as such, an equal distribution of her property would necessarily require some sort of division of camp assets.

As early as 1983 and no later than 1985, each member of the family was aware of the logistical difficulties presented by any division of the property and, although rarely discussed among members of the family, Tom and Attorney Ciardi were actively exploring alternatives for what Tom described as "splitting things up without any risk to anyone but myself." Plaintiff's Ex. 34. An early plan called for the sale of a portion of the land to the Town of Alton for use as a municipal beach. As originally conceived, the plan involved a subdivision of the

property and, potentially, either a liquidation of Camp Dewitt, Inc., or a re-distribution of the company's shares. These facts were communicated by Ciardi to Elizabeth Boyer in January 1985, correspondence. Following a series of negotiations conducted by Ciardi with the town attorney the deal was rejected by the town government in late 1985. Tom was very familiar with the progress and specific details of the negotiations while his siblings were generally familiar with the pendency of the negotiations.

Elizabeth was disappointed and, according to Paula, angry that Alton did not buy the land. Tom, however, did not view this as a setback because he had been exploring alternative development opportunities since at least January 1985 and, in fact, during the summer of 1985 he suggested to Ciardi that the family terminate negotiations with the town because a municipal beach would diminish the value of the property. By this time Tom, with Ciardi's knowledge, had engaged the professional services of Chester ("Rick") Chellman, the principal of the engineering and land development firm, White Mountain Survey; Rodney Dyer, a Laconia, New Hampshire real estate attorney; and Bob Emmel, a real estate consultant who believed the property could be developed into the "snobbiest" subdivision on the lake. Plaintiff's Ex. 26. At some point during the late summer Ciardi and Tom also discussed the creation of a partnership for use

7

during the subdivision approval process and, in a September 6, 1985, letter, Tom informed Ciardi that he had chosen the name Campfire Point Associates ("CPA") for what he termed "our partnership."  Plaintiff's Ex. 30.  Similar communications were exchanged between Tom and local attorney Dyer.

By January 1986, Tom's plans for the property had solidified.  In a letter to Ciardi he explained that, based on his understanding that Elizabeth "will be distributing an interest to each of the children," he would buy out the others' interests, develop the majority of the land as a subdivision, and operate Camp Dewitt on the remaining acreage.  Plaintiff's Ex. 33.  Tom wrote that Elizabeth "will resist the idea of me going into debt, but I prefer to look at it as a great opportunity . . . [th]is a good risk for me to assume and I should be able to convince Mom of this."  Id.  In a January 20, 1986, letter Tom formally presented the idea to his siblings:

> Sometime this spring the subdivision process will increase the value of the land but this should be after the gift [from Elizabeth to the children] has taken place.  My idea is to purchase your interests in the camp from each of you (and possibly Mom as well) using the equity I will have in the property from Mom's gift.
>
> *   *   *   *
>
> Am I crazy? I don't think so.  I feel that by developing the best 50 or 60 acres of camp that I can meet expenses.  That would leave about 40 acres for the camp.  Of course, I am assuming that we can come to an agreement with price and terms.  Well, lets give it a

8

try.  I am confident that things can be worked out fairly.  I would appreciate your thoughts on this and I would welcome the opportunity to get together to discuss it without Mom first.  If things don't work out we won't have to concern her and if they do then we can go to her together.

Plaintiff's Ex. 34.

Tom's letter did not spark extensive discussions with either sibling.  Paula telephoned Tom and asked for further details, which she never received.  At trial William recalled reviewing but not acting on the letter.  Despite their apparent lack of interest, the family members did undertake certain steps which were consistent with Tom's plan.  On February 28, 1986, each child signed an application for the registration of a trade name for submission to the New Hampshire Secretary of State.  Plaintiff's Ex. 119.  The application reserved the name "Campfire Point Associates," which was identified as a "general partnership" organized on "January 29, 1986."  The same day a second application was executed which was identical to the first in every respect except that it also included the signature of Elizabeth Boyer as a fourth general partner.  Defendant's Ex. O.  The children did not know why two versions of the same application were executed.  Dyer filed the second application with the state on March 13, 1986.

On April 2, 1986, Elizabeth, acting as the sole shareholder of Camp Dewitt, Inc., executed a warranty deed conveying the

9

property to herself in her individual capacity.  The deed was prepared by Paul Winterhalter, an associate in Ciardi's law office, with Tom's knowledge.  <u>See</u> Plaintiff's Ex. 40.  Paula and William were not aware of the conveyance at the time of its execution.  Around the same time Ciardi's law firm liquidated Camp Dewitt, Inc., and the camp operations were assumed by a new entity, Boyer Camps, Inc., which would operate on the property under a lease agreement with Elizabeth.

In April 1986, Tom asked Ciardi to prepare a partnership agreement for CPA which would reflect the plans for the property. Tom, who repeatedly testified that he relied on Ciardi's professional judgment, did not indicate what form of partnership the family wanted and even whether Elizabeth would join her children as a partner.  Likewise, beyond the casual discussions spawned by Tom's January 1986, letter, the family never discussed the partnership formation in any detail and certainly never reached consensus on these matters.  For example, Paula testified that, based on Fred's advice, she did not want to become a general partner because she questioned Tom's ability to develop the property and feared exposure to liabilities.  William, who had recently dissolved a debt-laden partnership, adopted essentially the same position.  Both siblings were more amenable to a limited partnership although such an arrangement would

10

necessarily minimize their control.  And Tom, who testified at trial that he never possessed a solid understanding of what a partnership was, at the time made clear that he did not want to cede control or share decision-making authority over the development with others.  See Plaintiff's Ex. 34 ("I would like the opportunity to design my own destiny regarding the camp rather than always be under a cloud.").  The confusion over the precise definition of the partnership extended to the attorneys as well, as evidenced by correspondence and by the fact that Dyer had two trade name applications executed.  See, e.g., Plaintiff's Ex. 37 (March 11, 1986, office memo in which attorney Dyer states that based on telephone conference with attorney Ciardi "As I understand it, Mrs. Boyer and her 3 children will all have an equal interest in the . . . partnership"); Plaintiff's Ex. 41 (April 2, 1986, correspondence from attorney Winterhalter to Tom stating "I understand that your mother will now be giving certain lots among the children and the three of you will form a partnership to develop that property").

During the summer of 1986 Elizabeth Boyer was also confused and indecisive over whether and how to dispose of the property. During June conversations with Paula and Fred, Elizabeth questioned the wisdom of gifting the property to a partnership. Fred testified that at the time Elizabeth expressed concern that

11

Tom and Ciardi were moving ahead with their plans without properly explaining important matters, such as the potential tax consequences, and reiterated her lack of confidence in Tom's ability to develop the land successfully.

Despite this widespread confusion, the siblings' trial testimony was uniform in two key respects. First, Tom, William, Paula, and Fred each adamantly stated that there never was a partnership agreement, there never was a partnership, and that there never could have been a partnership because they didn't agree on the structure or membership of the partnership. Second, each testified that they understood the purpose of the purported partnership was to accept title to the property, to serve as the formal entity for the subdivision permitting process, and, at the proper time, to convey complete ownership of the property to Tom, who would compensate his purported partners, William and Paula, for relinquishing their interests and who would develop the land on his own.

On or about June 10, 1986, Dyer mailed to Tom an unexecuted warranty deed for Elizabeth to convey the property in its entirety to the partnership. Upon receipt, Tom filed the deed in a Camp Dewitt office drawer not used by Elizabeth. Tom did not tell Elizabeth about the existence of the deed even though he saw her several times each day.

12

In response to repeated requests, Ciardi finally mailed the first of several draft partnership agreements to Tom in July, 1986. The agreement listed the children and Elizabeth as the partners. Tom in turn, gave a copy to William as William was packing to return home after a vacation at the camp. In August Tom forwarded a copy to Paula, who passed it on to Fred for his review. Fred, the only member of the family who recalled reading any agreement, made several revisions to the proposed language and listed other concerns in an August 15, 1986, letter to Ciardi. There is no evidence that Elizabeth ever received or reviewed a copy of the agreement. There were no family discussions concerning partnership matters following distribution of the draft agreement.

III. Elizabeth's Illness

Elizabeth, who had a history of breast cancer, was in failing health during the summer of 1986. In July she experienced abdominal pain which worsened over time and, by August, was accompanied by fever and diarrhea. At various points during the summer she was treated on an out-patient basis by John Boornazian, a physician affiliated with the Huggins Hospital, Wolfeboro, New Hampshire.

13

Elizabeth's physical decline was apparent to each member of her family. Tom testified at length that as the summer continued she appeared increasingly lethargic and was unable to perform many of her beloved camp duties. These observations are consistent with those of William, who observed Elizabeth as weak and disengaged in late July 1986, and those of Paula, who thought her mother looked "terrible" on August 7, 1986.

On August 13, 1986, the day after camp closed, Paula drove Elizabeth to the Huggins Hospital, where she was admitted. She underwent various diagnostic testing and was prescribed narcotic medication. The following day, Paula observed that Elizabeth was disoriented, agitated, heavily sedated and, at times, would rant angrily about seemingly insignificant matters, such as the fact that a certain Philadelphia-area youth refused her offer of a camp scholarship.

Elizabeth stayed at the Huggins Hospital until August 21, 1986, when she was transferred to a hospital located near her Philadelphia home. An August 21, 1986, surgical exploration of her abdomen revealed an inoperable tumor that physicians attributed to metastatic disease related to her prior breast cancer. She died on August 24, 1986.

14

IV.  The Execution of the Deed

During the evening of August 13, 1986, Tom was working on camp paperwork and, according to his testimony, he came across the deed Dyer prepared in June to convey Elizabeth's ownership of the property to the partnership.  Realizing that "th[e] deed is supposed to be signed by [his] mom," Tom decided, without consulting another member of the family or counsel, that he would bring it to her the following morning.

When Tom arrived at the hospital on August 14, Elizabeth was sleeping.  He woke her at approximately 10 a.m. and told her that she needed to sign some papers for the family.  Elizabeth neither asked any questions about Tom's request nor manifested any indication that she understood the subject matter of the papers. Tom then left the room to summon the hospital's notary public. Approximately five minutes later, he returned to the room and discovered that Elizabeth had fallen asleep.  Tom again woke her up and, again, she fell back asleep.  Tom next stationed himself in the doorway of the hospital such that he could look down the corridor.  When he saw the notary walking towards the hospital room, Tom returned to his mother's bedside and woke her for a third time.

In the presence of the notary, Tom handed his mother the deed and, supporting the document on a magazine, handed Elizabeth

15

a pen. When asked by the notary if she understood the significance of the document, Elizabeth nodded affirmatively, said something to the effect of "He's my son," and signed the deed without reading it. She fell asleep almost immediately after the notary left. Elizabeth never discussed the signing of the deed with any of her children at any point thereafter.

Approximately one-half hour after presenting the deed to Elizabeth, Tom left the hospital. Soon thereafter Tom told Dyer about the signed deed and, after being unable to reach Ciardi, spoke with Ciardi's associate, Winterhalter, who said to record the deed if to do so was part of the overall plan Tom had developed with Ciardi. On August 15, 1986, Tom went to Laconia to arrange for the deed to be recorded. That morning he told Paula of his plan to record the deed, but did not reveal the nature of the deed, the land conveyed, or the circumstances under which it had been executed. The deed was recorded that day with the Belknap County Registry of Deeds.

William, Paula, and Fred learned of the recordation some days later but prior to Elizabeth's death on August 24, 1986. No one expressed concern. At around the same time Tom told Ciardi, who was displeased that the deed had been recorded but did not suggest that the family undertake any additional or curative measures with respect to the conveyance.

16

V.   The Aftermath

Following Elizabeth's death, the children, Ciardi, and other professionals involved in family finances and the development process treated the August 14, 1986, deed as if it was a valid conveyance to a partnership comprised of the three children.  The estate was probated in Pennsylvania, with no ancillary proceedings in New Hampshire.  According to Fred, even though the execution of the deed was a "mistake," clarity and continuity required that all involved parties treat the transaction, which was formally recorded in county records, as if it were valid.

The court incorporates additional findings of fact in its application of the relevant legal issues, infra.

## Discussion

Hilco claims that the August 14, 1986, transaction was a valid conveyance from Elizabeth Boyer to CPA, a legally organized partnership and, as a result, the estate never held title to the Alton property.

The defendants argue in unison, at least for purposes of this phase of the case, that the conveyance was invalid because at the time of execution Elizabeth was incompetent or, in the alternative, because no partnership existed to receive title. Under either theory of gift invalidity, the property did not pass

17

as recorded with the registry of deeds but instead passed through Elizabeth's estate in accordance with her will.

## I.   Elizabeth Boyer Lacked the Capacity to Execute the Deed

New Hampshire courts recognize the common law principle that a donor must possess sufficient mental capacity to make a valid gift and this capacity is measured by the standards governing testamentary capacity in will contests.  See DeGrandpre, 7 New Hampshire Practice: Wills, Trusts and Gifts § 33.03 (2d ed. 1992) (citing Harvey v. Provandie, 83 N.H. 236, 141 A.2d 136 (1928); Curtice v. Dixon, 74 N.H. 386, 68 A.2d 587 (1907); 38 Am. Jur. 2d Gifts § 12 (1968)).  The law presumes every donor to be sane, and, as such, the defendants bear the burden of establishing Elizabeth Boyer's incompetency.  See Dennett v. Dennett, 44 N.H. 531, 539 (1863).  Finally, "the deed of a mentally incompetent person is not void, but is regarded as voidable only" and, therefore, is subject to a post-conveyance ratification by the grantor upon regaining competency, by the grantor's guardian, or by the grantor's heirs.  Sawtelle v. Tatone, 105 N.H. 398, 402, 201 A.2d 111, 115 (1964) (citing O'Grady v. Deery, 94 N.H. 5, 45 A.2d 295 (1946); Finch v. Goldstein, 245 N.Y. 300, 157 N.E. 146 (1927)).

In <u>Boardman v. Woodman</u>, 47 N.H. 120 (1865), the New

Hampshire Supreme Court, <u>inter alia</u>, affirmed the trial court's

use of the following jury instruction on testamentary capacity:

> That, in determining what is a sane mind, so far as
> relates to mental capacity, the law has reference to
> the act to be performed, and requires that the
> testatrix's mental capacity should be adequate to the
> purpose; that is to making the will in question; to
> determining upon and making the disposal of the
> property given by the will in the manner in which it is
> there given; that in order to have sufficient mental
> capacity to make the will, . . . at the time of making
> it [the testatrix] must have been able to understand
> the nature of the act she was doing, to recollect the
> property she wished to dispose of and understand its
> general nature.

47 N.H. at 122.  The standard for competency is not demanding as

"all that the law requires to make a deed effectual, is that a

man should have possession of his reason so as to understand the

effect of the act he is about to perform, and to be capable of

carrying that act into effect."  <u>Dennett</u>, 44 N.H. at 538; <u>see</u>

<u>Boardman</u>, 47 N.H. at 138 (same).  Thus, when examining

competency, the court must determine whether the grantor

understood the nature of the transaction, was "cognizant of the

quality and quantity of the property" at issue, was able to judge

rationally who would receive the property, and must understand

the manner in which the property is to be distributed.  <u>See</u>

Murphy & Pope, <u>New Hampshire Civil Jury Instructions</u> § 34.2 (Rev.

ed. 1993); <u>see</u> <u>also</u> <u>Curtice</u>, 74 N.H. at 399.  The court must

19

carefully weigh the circumstances attendant to a challenged conveyance because "[n]o marked line can be drawn at which weakness of mind becomes so great that the party ceases to be capable of binding himself by his contract or conveyance." Dennett, 44 N.H. at 538.

The parties adduced considerable evidence in support of their respective positions on Elizabeth Boyer's competency at the time she executed the deed. This evidence included the lay testimony of each child and Fred; the deposition testimony of Boornazian, the treating physician, and of Diane Lourie, the notary public; and the expert testimony of two psychiatrists, Robert Toborowsky and Albert Drukteinis.

The defendants have satisfied their burden of rebutting Elizabeth's presumptive capacity at the time she executed the deed. First, the court finds that on the morning of August 14, 1986, Elizabeth was disoriented and unaware of rudimentary family matters, such as the birth of her first granddaughter. This disorientation is further evidenced by her inability to engage in a coherent conversation with either Paula or Tom, with whom she was close, and the fact that she ranted on at least two occasions about a celebrity youth who refused a Camp Dewitt scholarship.

Second, the medical records and expert testimony establish that the administration of narcotic painkillers, including

20

Demerol, created a sedative effect even at the moderate doses prescribed and made it difficult for her to stay awake long enough to focus for any length of time on financial matters. The sedative effect of this medication is consistent with the observations of Paula and Tom that their mother slept constantly and, more significantly, that Tom needed to wake his mother up on three occasions in order for her to sign the deed.

Third, by the morning of August 14, 1986, the sedative effect of the medication may have been compounded to some limited degree by her diminished kidney function, a condition which developed into complete renal failure in the days that immediately followed.

Fourth, Elizabeth neither read the deed nor questioned its contents. This apparent lack of concern contrasts starkly with the testimony of Paula and Fred that Elizabeth harbored serious reservations about Tom's plans and abilities in general and, in particular, was ambivalent about the proposed conveyance by gift to a partnership. For example, Fred testified that Elizabeth did not understand the potential tax consequences of a gift and was irritated that Ciardi was inattentive to such matters during the probate of her husband's estate. There is no evidence to suggest that her concerns had been allayed or even addressed prior to the execution of the deed. Although there is nothing inherently

21

suspect about an individual changing her mind and a mere change in position is scant evidence of incapacity, the court finds that in this case Elizabeth's willingness to yield her position without even a brief dialogue supports the conclusion that she did not and could not comprehend the nature and consequences of her conduct.

Fifth, the court attaches significance to Tom Boyer's conduct at the time. Specifically, Tom, who knew his mother was not convinced of the wisdom of his plans, held the deed for approximately two months without soliciting his mother's signature. Then, upon discovering the grave nature of her illness, he conveniently came across the deed while doing routine camp paperwork and decided, without consulting other members of the family, to have Elizabeth sign it the next morning. The hasty recordation followed. At a minimum, Tom's conduct gives rise to a suspicion of mendacity because his actions appear calculated to have a deed executed that he believed Elizabeth would not have signed if not encumbered by ill-health.

Sixth, the court credits Dr. Drukteinis' conclusion that the contemporaneous medical records do not support the defendants' claim that Elizabeth suffered from delirium on August 14, 1986. However, this conclusion is relatively insignificant because the court finds that the Huggins Hospital staff, unlike the Boyer

22

children, was not familiar with Elizabeth's demeanor prior to her hospitalization and, as such, lacked a baseline with which to compare her behavior on the date in question. In any event, at the time the medical staff commented on Elizabeth's condition they were in all likelihood concerned with her relative alertness and orientation with respect to basic life circumstances, i.e., name and location, and not with respect to whether she possessed the mental capacity to understand the basic effect of the gift.

Seventh, the court's finding of incapacity is not seriously undermined by the deposition testimony of the Diane Lourie, the notary public. The elicitation of an affirmative nod in response to Lourie's usual boilerplate question, i.e., "asking the patient if she knew what she was signing," carries little weight, particularly because the notary's memory was vague concerning the event.

In sum, the court finds by a preponderance of the evidence that Elizabeth Boyer lacked the capacity to understand, even if she wanted to understand, the nature and effect of the deed. Accordingly, the August 14, 1986, deed is valid but voidable. However, for the reasons discussed infra, the defendants are estopped from voiding or otherwise challenging the gift on the ground of donor incapacity or on any other grounds.

23

## II. There was a Partnership

New Hampshire has adopted the Uniform Partnership Act ("UPA"), which defines a partnership as "an association of two or more persons to carry on as co-owners a business for profit." N.H. Rev. Stat. Ann. § ("RSA") 304-A:5. The association must be voluntary and must be based on an agreement between the parties. E.g., Loft v. Lapidus, 936 F.2d 633, 636 (1st Cir. 1991) (citing 1 Z. Cavitch, Business Organizations With Tax Planning, § 14.01 (1991); 1 A. Bromberg & L. Ribstein, On Partnership, § 2.01 (1988)). However, the agreement need not be reduced to writing as the requisite intent to form a partnership may be implied from the parties' actions. See Kansallis Finance Ltd. v. Fern, 40 F.3d 476, 478-79 (1st Cir. 1994) (applying UPA); Loft, 936 F.2d at 636-37; Stone and Michaud Ins., Inc. v. Bank Five for Sav., 785 F. Supp. 1065, 1069 (D.N.H. 1992) (applying New Hampshire law and citing Higgins v. Higgins, 125 N.H. 806, 809, 486 A.2d 294, 296 (1984)); In re S & D Foods, Inc., 144 B.R. 121, 158-59 (D. Col 1992) (applying UPA).

The conduct of the parties and the circumstances surrounding their relationship and transactions control the factual question of whether a partnership existed in cases where the parties have not documented their intentions in a written agreement. See, e.g., Kansallis Finance, 40 F.3d at 479; Loft, 936 F.2d at 637;

24

Shaw v. Delta Airlines, Inc., 798 F. Supp. 1453, 1455 (D. Nev. 1992) (applying UPA); Bank Five, 785 F. Supp. at 1069. Although "there is no specific test to determine the existence of a partnership," Shaw, 798 F. Supp. at 1455, courts consult a variety of factors including whether the parties intended to proceed as partners, have shared profits or losses, had the right to participate in the control of the enterprise, or commonly held real property, see RSA 304-A:8; Kansallis Finance, 40 F.3d at 479; In re Medallion Realty Trust, 103 B.R. 8, 12-14 (Bankr. D. Mass. 1989) (citing cases), aff'd, 120 B.R. 245 (D. Mass. 1990); see also In re Schyma, 68 B.R. 52, 61-62 (Bankr. D. Minn. 1985) (applying UPA, court found no partnership where, inter alia, parties "conducted themselves fully as if they each retained separate title to their individual assets," where there was no evidence that record title to real estate and chattels was ever transferred into "any form of joint ownership or ownership by a named partnership," no pooling of assets, no representations to others as a partnership, and where only indicia of partnership were statements made on tax returns). This non-exhaustive list focuses the inquiry on what actually transpired between the purported partners because the law of partnership "fixes the legal consequences which flow from the conduct of the parties." In re Medallion, 103 B.R. at 13 (citations omitted). And

25

although the question of intent is a crucial part of the calculus, "the only necessary intent . . . is an intent to do those things which constitute a partnership." Id. Thus,

> [t]he key factor is not the subjective intent of the parties to form a partnership . . . . It is immaterial that the parties do not call their relationship, or believe it to be, a partnership, especially where the rights of third parties are concerned.

Shaw, 798 F. Supp. at 1455 (citations omitted); see In re S & D Foods, 144 B.R. at 159 ("substance and not name determine the legal relationship."); In re Thomas W. Cooper, 128 B.R. 632, 636 (Bankr. E.D. Tex. 1991) (under UPA, "statements of the parties as to whether they have intended to form a partnership [are] not conclusive on the question of whether a partnership is formed," even where parties expressly disavow the intent to form partnership in writing, because "if they intend to do a thing which in the law constitutes a partnership, they are partners whether their expressed purpose was to create or avoid the relationship") (citation omitted); see also Johnson v. United States, 632 F. Supp. 172, 173 (W.D.N.C. 1986) (in tax context, "parties' intention is not to be determined from their protestations that a partnership was not intended") (citing United States v. Levasseur, 80-1 U.S.T.C. ¶ 9349 (D. Vt. 1980)).

The UPA not only recognizes implied partnerships based on the conduct of the parties with respect to each other but also

26

invites courts to bind individuals, regardless of their actual

relationship to the partnership, to partnership liability under

an estoppel theory based on their conduct to third-parties.

**Partner by Estoppel**

I.   When a person, by words or spoken or by conduct, represents himself, or consents to another representing him to any one, as a partner in an existing partnership or with one or more persons not actual partners, he is liable to any such person to whom such representation has been made, who has, on the faith of such representation, given credit to the actual or apparent partnership . . . .

II.  When a person has been thus represented to be a partner in an existing partnership, or with one or more persons not actual partners, he is an agent of the persons consenting to such representation to bind them to the same extent and in the same manner as though he were a partner in fact, with respect to persons who rely upon the representation.  Where all the members of the existing partnership consent to the representation, a partnership act or obligation results . . . .

RSA 304-A:16.  "The estoppel provision is limited in scope,

equitably imposing liability for misrepresentations of

partnership upon those who hold themselves out as partners."  In

re Cynthia K. McBee, 714 F.2d 1316, 1322-23 (5th Cir. 1983).

Thus, RSA 304-A:16 operates to "estop[] individuals from denying

their purported relationship to those relying upon the

misrepresentations."  Id.  "The hallmark of estoppel is

detrimental reliance" and courts typically require that the

representations actually led a third party to change position.

Walker v. Walker, 854 F. Supp. 1443, 1447 (D. Neb 1994) (applying

UPA and citing <u>Havelock Meats, Inc. v. Roberts</u>, 186 Neb. 73, 78, 180 N.W.2d 875, 878 (1970)); <u>see</u> <u>also</u> <u>Blalcock v. United States</u>, 695 F. Supp. 874, 879 (N.D. Miss. 1988) (in tax context, parties who "held themselves out as a partnership and reported income as a partnership . . . are estopped from denying that [their entity] is a partnership") (citations omitted); <u>S & D Foods</u>, 144 B.R. at 159 ("a party is estopped to deny the existence of a partnership where that party has executed documents on behalf of the partnership.") (citation omitted); <u>cf.</u> <u>NCNB National Bank of North Carolina v. Bridgewater Steam Power Co.</u>, 740 F. Supp. 1140, 1158 (W.D.N.C. 1990) (sitting in diversity, District of North Carolina adopted more narrow view and concluded that in New Hampshire "[t]he theory of partner by estoppel applies only when a person or entity extends credit to the partnership.").

The court finds that, under the UPA as adopted by New Hampshire, on August 14, 1986, each child held a one-third interest in a general partnership known as Campfire Point Associates and, on that day, the partnership was legally capable of accepting title to real property. Although the children never executed a written agreement and, in fact, could not agree on certain terms, their individual and joint conduct establishes beyond serious doubt that the partnership existed.

28

Based on the evidence, it is apparent that the children, Fred, and the lawyers each understood CPA to be the vehicle which would perform a limited number of important functions relative to the distribution of the Alton property. This common understanding included, at a minimum, that CPA would receive the property as a gift from Elizabeth, would serve as the entity that applied for whatever state and municipal approvals and permissions were required to subdivide it and, at some later point, convey the property to Tom in a transaction in which William and Paula would be fairly compensated for their interest. Although since 1990 the children have adopted the position that CPA was never a partnership, their prior conduct belies these conclusory statements and, indeed, strongly supports a contrary finding.

First, the partnership performed the precise role it was understood by the children to serve. The CPA name, having been formally reserved for use by a New Hampshire general partnership, applied for and over time received various permits and permissions. The entity accepted title from Elizabeth on August 14, 1986, held title for approximately nine months and, on May 11, 1987, conveyed title to Tom, who undertook to compensate his siblings for their interests.[2]

_____

[2]No compensation was given to the estate because Elizabeth was not a partner.

29

Second, the three partners shared in both the proceeds and losses associated with the partnership's principal asset, the Alton property. That is, during tax years 1986 and 1987 each partner reported to the Internal Revenue Service the losses they sustained as a result of the partnership. In May 1987, each partner shared the proceeds generated from the sale of the partnership property: William and Paula each received cash, title to a waterfront lot and a future obligation if land sales were to reach a certain financial benchmark, while Tom received the bulk of the real property.

Third, each child exercised control over the disposition of the partnership property, the proceeds of which were distributed according to a plan approved and, ultimately, signed by each partner.

Fourth, the children held themselves out as partners to third parties, including the New Hampshire Secretary of State, the IRS, the Alton Planning Board, various professionals involved with the development project, and any party, known or unknown, who had reason to rely on New Hampshire's land recordation system at the Belknap County Registry of Deeds.

Fifth, even if the court were to credit the children's testimony that they never considered themselves or intended themselves to be partners, such subjective perceptions carry

30

little or no evidentiary weight in light of the children's actual conduct.

In view of the foregoing, the court concludes that the Boyer children intended to and, in turn, actually did, engage in conduct which would constitute a partnership. Accordingly, at all relevant times Campfire Point Associates was a New Hampshire general partnership within the meaning of the Uniform Partnership Act, RSA 304-A et seq.

In the alternative, the court finds that in this case RSA 304-A:16 operates to create a partnership by estoppel. The children, acting both as individuals and collectively, represented themselves, or allowed themselves to be represented by others, as partners to third parties. On multiple occasions the children executed legally significant documents, including deeds, contracts, and sworn tax returns, which explicitly declared the existence of and their membership in the partnership. These representations were designed to induce reliance by third parties and, in fact, did cause third parties to change position. The third parties included the IRS, which allowed deductions for partnership losses, the State of New Hampshire, which reserved a tradename for the partnership, the Town of Alton, which undertook the subdivision development approval process under the belief that CPA was a partnership, and

any party, known or unknown, who reasonably relied on the integrity of New Hampshire's land recordation system. Having reaped the benefits of their representations, the children and CPA are statutorily estopped by the UPA to deny CPA's status as a partnership.

## III. Estoppel

Throughout the litigation of this case Hilco has urged that the defendants are estopped from denying the validity of the August 24, 1986, conveyance. The children have replied that Hilco's own conduct bars application of an estoppel theory while the government argues that even if the children were estopped from disavowing the conveyance, such estoppel cannot strip innocent third parties from asserting rights to the property.

The court rejected Hilco's estoppel theory at the summary judgment stage by order of August 18, 1994. Upon reconsideration of that ruling the court observed that "[i]ssues of estoppel may yet come into play in this action. . . . Before the court can appropriately consider issues related to estoppel, the parties must resolve the issue of title as determined by the statutory and common law relevant thereto." Hilco v. United States, No. 93-390-JD, slip op. at 2 (D.N.H. Sept. 22, 1994).

At trial the parties stipulated that Elizabeth Boyer owned the property in her individual capacity immediately prior to the purported conveyance of August 14, 1986. The parties, of course, dispute whether that conveyance transferred the property to CPA. The court has already ruled, <u>supra</u>, that under New Hampshire law the conveyance was valid but voidable because Elizabeth Boyer lacked the requisite capacity but not because CPA was not a partnership capable of receiving title. Thus, in the opinion of the court the chain of the title is as resolved as it can be under New Hampshire law without application of equitable doctrines and, accordingly, such doctrines may now be considered.

A.   <u>Equitable Estoppel</u>

At common law,

[t]he doctrine of estoppel is based upon the grounds of public policy, fair dealing, good faith, and justice, and its purpose is to forbid one to speak against his own act, representations, or commitments to the injury of one to whom they were directed and who reasonably relied thereon. The doctrine of estoppel springs from equitable principles and the equities in the case. It is designed to aid the law in the administration of justice where without its aid injustice might result. . . . [The doctrine] concludes the truth in order to prevent fraud and falsehood and imposes silence on a party only when in conscience and honesty he should not be allowed to speak.

The proper function of equitable estoppel is the prevention of fraud, actual or constructive, and the doctrine should always be so applied as to promote the

33

> ends of justice and accomplish that which ought to be done between man and man.
>
> \* \* \* \*
>
> From a practical standpoint, the effect of an equitable estoppel . . . is to prevent the assertion of what would otherwise be an unequivocal right or to preclude what would otherwise be a strong defense.

28 Am. Jur. 2d, Estoppel and Waiver, §§ 28, 29, 33 (1966) (also noting that "estoppel closes the mouth of the witness and thus creates an extraordinary legal situation"). New Hampshire has explicitly recognized the doctrine of equitable estoppel, see, e.g., Hawthorne Trust v. Maine Sav. Bank, 136 N.H. 533, 537-38, 618 A.2d 828, 831 (1992), and the state supreme court has observed that as a general matter "[a]n equitable remedy should be imposed in situations involving real estate absent evidence that the remedy is impossible or inequitable." Gosselin v. Archibald, 121 N.H. 1016, 1020, 437 A.2d 302, 306 (1981) (citing Johnson v. Korsak, Inc., 120 N.H. 412, 415, 415 A.2d 1141, 1143 (1980)).

Given its purpose, i.e., to ensure justice where otherwise there would be none, the doctrine is necessarily flexible and, as such, its application "rests largely on the facts and circumstances of the particular case." Goodwin R.R. Inc. v. New Hampshire, 128 N.H. 595, 600, 517 A.2d 823, 827 (1986) (quoting Monadnock School Dist. v. Fitzwilliam, 105 N.H. 487, 489, 203

A.2d 46, 48 (1964)).  The basic elements of equitable estoppel
are:

>1)    a representation or a concealment of material
>facts;
>
>2)    made by the estopped party with knowledge of the
>facts;
>
>3)    to a party or parties which were ignorant of the
>truth of the matter;
>
>4)    that the representation or concealment was made
>with the intention or knowledge that the other party or
>parties would be likely to act upon it; and
>
>5)    that the other party or parties actually did act
>upon it.

See Town of Nottingham v. Lee Homes, Inc., 118 N.H. 438, 442, 388
A.2d 940, 942 (1978) (citing Bigwood v. Merrimack Village Dist.,
108 N.H. 83, 87, 229 A.2d 341, 344 (1967); Monadnock School
Dist., 105 N.H. at 491, 203 A.2d at 49-50); accord Healey v. Town
of Burham Zoning Bd. of Adjustment, 140 N.H. 232, ___ , 665 A.2d
360, 367 (1995) (citing City of Concord v. Tompkins, 124 N.H.
463, 467-68, 471 A.2d 1152, 1154 (1984)).

The doctrine does not require that the estopped party have
acted with malice or specific intent to influence a particular
party so long as the party's "representation was intended to
induce or calculated to induce all persons who might have
occasion to act upon it, to believe it to be true, and act
accordingly."  Drew v. Kimball, 43 N.H. 282, 286-87 (1861).

Likewise, estoppel may be grounded in silence or inaction as well as explicit words and open actions. Concrete Constructors, Inc. v. Harry Shapiro & Sons, Inc., 121 N.H. 888, 892-93, 436 A.2d 77, 80 (1981) (citations omitted); accord Drew, 43 N.H. at 287 ("it is of no importance [that the representations] were made in express language to the person himself, or implied from the open and general conduct of the party.").

Finally, the court's estoppel analysis involves a strictly factual inquiry, Goodwin R.R., 128 N.H. at 600, 517 A.2d at 827 (citing Olszak v. Peerless Ins. Co., 119 N.H. 686, 690, 406 A.2d 711, 714 (1979)); accord Lee Homes, 118 N.H. at 443, 388 A.2d at 942-43 (citations omitted)), which must be guided by the doctrine's core principal of fairness:

> And if, whatever a man's real intention may be, he so conducts himself that a reasonable man would take the representation to be true, and believe that it was meant that he should act upon it, and did act upon it as true, the party making the representation would be equally precluded from contesting its truth.

Drew, 43 N.H. at 285 (citations omitted); see also Goodwin R.R., 128 N.H. at 600, 517 A.2d at 827 ("Estoppel precludes one party from taking a position contrary to one previously asserted when to do so would be unfair.") (citation omitted).

The circumstances surrounding this chain of title dispute present an unusually strong, albeit somewhat unorthodox, case for equitable estoppel. Unlike many reported equitable estoppel

36

cases, where equitable principles operate to balance the individual interests of one private litigant against those of another, the success of the children's current litigation position would undermine public policy and pose a great risk of injustice to others not before the court. Specifically, the land recordation system is the public mechanism upon which individuals must rely when engaging in real estate transactions in this state. Although the system must tolerate a degree of imprecision, public policy dictates that chain of title errors be avoided because of the enormously disruptive effect to those who hold an interest derivative of the erroneous title. Title errors are particularly menacing when undetected for a substantial period of time and where, as here, the property at issue has been subdivided into dozens of individual lots, many of which have been purchased by individuals who did not and could not have protected themselves. Thus, as a threshold matter the court rejects the defendants' attempt to narrowly cast the estoppel issue as a fairness contest between three children, purportedly mislead by incompetent lawyers, and a bank whose hands have been soiled by inattentive loan officers and fraudulent practices. Instead, the court's estoppel analysis must rest on a broader view of this case, one which also takes cognizance of the potential injustice to those who actually did have occasion to

37

rely on the registry of deeds as well as the unusually strong need to maintain a land recordation system which is not vulnerable to ex post facto modifications.  Against this backdrop, the court next examines the conduct that Hilco asserts justifies estoppel.

Based on its review of the evidentiary record, the court finds that the children, acting as individuals, as the partnership, and through various lawyers and agents, engaged in a sustained pattern of conduct in which they represented the validity of the August 14, 1986, conveyance and the accuracy of derivative conveyances as recorded in the chain of title, including the 1987 conveyance to Tom and all subsequent conveyances.  In particular, the children concealed their knowledge of potential problems pertaining to 1) CPA's legal status as a partnership, concerns which were immaterial given the court's finding, supra, that the partnership existed; and 2) their mother's mental capacity, concerns which were highly material given the court's finding, supra, that she lacked the requisite capacity.

First, beginning during the summer of 1986, the children engaged in conduct which was intrinsically linked to the validity of the August 14, 1986, conveyance and which is antagonistic to their current position that title passed through Elizabeth's

38

estate. Indeed, the children created the chain of title and, in so doing, affirmatively represented to the registry of deeds and all those who rely on the registry of deeds that it was accurate as recorded or, at least, that it was not susceptible to the attack they now mount. The evidence establishes that, after foisting the deed on his bedridden mother, Tom hastily recorded the conveyance at the registry of deeds. The deed conveyed the property to the partnership, of which Tom was a partner, and, as such, his conduct and knowledge relative to the conveyance and recordation is imputed to the partnership and to William and Paula, the other partners. See RSA 304-A:9-15 (each partner is agent of partnership, partnership is bound by admissions, representations, and wrongful acts or omissions of individual partner, partnership is bound by breach of trust of individual partner, and all partners are jointly and severally liable for all liabilities chargeable to partnership). On June 4, 1987, each child signed, as the "sole partners" of CPA, another deed, this time conveying the property to Tom in his individual capacity. The deed is derivative of the August 14, 1986, deed and, in fact, expressly references that conveyance. At various later points each child again confirmed the validity of Elizabeth's conveyance and extended the chain of title by executing formal deeds derivative of the June 4, 1987, and August

39

14, 1986, conveyances. For example, more than two years after Elizabeth died, Tom conveyed to William and sister-in-law Mary a lot on the property by an October 19, 1988, warranty deed, which recited, <u>inter</u> <u>alia</u>,

> For Grantor's title, see deed of Elizabeth H. Boyer to Campfire Point Associates dated August 14, 1986, recorded in Book 959, Page 663 of the Belknap County Registry of Deeds. See also Campfire Point associates to Thomas S. Boyer dated June 7, 1987, recorded in Belknap County Registry of Deeds . . . .

Plaintiff's Ex. 6 at 2; <u>see</u> Plaintiff's Ex. 7 at 2 (identical deed executed by Tom conveying another lot to Paula and Fred). Likewise, on June 8, 1987, Tom executed a mortgage deed to First NH - White Mountain Bank, <u>see</u> Plaintiff's Ex. 4; on September 21, 1993, William and his wife executed a deed conveying their lot to third parties, <u>see</u> Plaintiff's Ex. 17; and on October 17, 1993, Paula and Fred executed a deed conveying their lot to third parties, <u>see</u> Plaintiff's Ex. 18.[3] Each of the latter two deeds identified the property by reference to the corresponding October 19, 1988, deed. Significantly, each one of these nine deeds was signed by at least one Boyer child, each one was recorded at the

---

[3]On at least two other occasions Tom conveyed lots derivative of the disputed conveyance to third parties by warranty deeds which identified Tom's title by reference to the August 14, 1986, conveyance from Elizabeth to CPA and the June 4, 1987, conveyance from CPA to Tom. <u>See</u> Plaintiff's Ex. 12(A) (March 5, 1990, conveyance to third parties Robert and Elin Muellner for $285,000); Plaintiff's Ex. 12(B) (July 11, 1991, conveyance to third party Sandra Vandy).

40

registry, and the validity of each one rests entirely on the validity of the August 14, 1986, conveyance. None of these documents suggest that CPA never existed as a partnership or that Elizabeth Boyer was incapacitated at the time of the gift.

The Boyer children engaged in a second pattern of conduct which did not directly involve property recordation but which plainly was intended to reflect and capitalize on the chain of title they recorded with the registry of deeds. In 1986 and 1987 CPA filed partnership tax returns with the IRS which claimed, inter alia, income, expenses, and losses attributed to the property conveyed by Elizabeth on August 14, 1986. See Plaintiff's Exs. 113(a) & (c). Completed K-1 schedules indicate that each partner sustained a partnership loss of nearly $15,000 in 1986 and a loss of approximately $8,500 in 1987. See id. Similar representations were made to revenue authorities in at least two states. See Plaintiff's Ex. 113(b) (1986 New Hampshire Partnership Business Profits Tax return); Plaintiff's Exs. 113(e) & (g) (1986 and 1987 New Jersey Income Tax - Resident Returns). The children's acceptance of tax benefits for partnership losses presupposes that CPA both existed as partnership and held title to the property as conveyed by Elizabeth on August 14, 1986.

Beyond the filing of tax returns, the children and the estate affirmatively represented that the August 14, 1986,

41

conveyance was valid in various legal documents filed by Prusky with the IRS in support of the estate's tax protest. For example, in a November 27, 1989, taxpayer statement of position the estate asserted that:

> On August 14, 1986, decedent deeded the property to Campfire Point Associates, a partnership composed of her 3 children, Thomas, William and Paula, so that they could be in a position to develop the property after subdivision approval would be received.

Plaintiff's Ex. 92 at 2. Tom reviewed the pleading and, in a December 3, 1989, letter, expressed his concern that Prusky omitted a comparatively trivial fact but gave no indication that he believed any of the statements pertaining to the validity of the August 1986, deed were erroneous. See Plaintiff's Ex. 93. Likewise, on March 8, 1990, Tom, acting as executor, signed under the penalties of perjury the estate's formal IRS tax protest which included, verbatim, this description of the August 1986, conveyance. See Plaintiff's Ex. 97 at 4.

The children also made representations consistent with the recorded chain of title to government entities other than tax authorities. The Town of Alton Planning Board entertained and eventually approved a subdivision plan for the property based in part on the statement of Attorney Millham, Dyer's partner, "that both phases of the development are planned by Campfire Point Associates who are Thomas Boyer, William Boyer ant [sic] Paula

42

Boyer Scheibe."  Plaintiff's Ex. 60 (minutes of January 12, 1987, planning board meeting).  Likewise, on September 14, 1989, Tom swore to the veracity of his sole ownership of the property in an "annual report for subdivision" that was filed with the New Hampshire Attorney General.  See Plaintiff's Ex. 90.[4]  These affirmative representations would have been neither accurate nor even necessary if CPA did not receive title through the August 14, 1986, conveyance.

In addition to their many public representations, the children's relationships with various private entities is also

---

[4]Tom's willingness to sign any document to advance his financial interest and plans for the land development, apparently without concern for the accuracy of its contents, casts a shadow on his credibility.  For example, despite his knowledge that the New Hampshire Department of Revenue and the IRS had begun initial investigations into the tax treatment of the property no later than 1988, see, e.g., Plaintiff's Exs. 85-88, in September 1989 Tom answered "no" to the following question on the sworn annual report submitted to the New Hampshire Attorney General:

> Is there presently pending, or has there been since the date of the subdivider's application or last annual report, any action (including, but not limited to audits, investigations, administrative conferences or proceedings, or court action) by which any governmental authority - local, state or federal - which: (a) concerns any form of tax liability or potential tax liability of the subdivider or any officer, director or principal of the subdivider; and (b) could materially affect the owners of lots, parcels, units or interests in the subdivision or prospective purchasers of such lots, parcels, units or interests?

Plaintiff's Ex. 90 at 9.

entirely consistent with the recorded chain of title. Most notably, in a May 11, 1987, "Agreement of Sale and Withdrawal" William and Paula purportedly sold their interests in CPA, including title to the property, to Tom in exchange for $670,000 and $675,000, respectively, and the retention by each seller of one lot. See Plaintiff's Ex. 3. The first page of the signed agreement recites and incorporates the recorded chain of title:

> Prior to her death, Elizabeth H. Boyer by Deed dated August 14, 1986 conveyed a certain tract of real property . . . consisting of approximately 95 acres. This property was conveyed by Elizabeth H. Boyer to a partnership registered in the State of New Hampshire known as Campfire Point Associates whose partners included William R. Boyer, Paula Boyer Scheibe and Thomas S. Boyer.

Id. at 1. The agreement concluded:

> It is understood that this Agreement contains the complete and entire Agreement and understanding between the Sellers and Buyer and there are no other terms, obligations, covenants, representations, statements or conditions, oral or otherwise of any kind whatsoever concerning this Agreement. . . .
> IN WITNESS WHEREOF, intending to be legally bound, the parties have executed this Agreement . . . .

Id. at 7. The completed signature block followed.

At trial, Fred testified that the agreement, which he reviewed on Paula's behalf, was executed because the bank wanted to finance the development with Tom alone and, as such, asked that the sale of the land and the withdrawal of the two other partners be memorialized in writing. Thus, completely aside from

44

the question not presently before the court of whether the bank was on notice of an infirmity in the chain of title, the children willingly signed, for financial gain, a document which plainly stated key facts they now disavow, _i.e.,_ the existence of the CPA partnership, its ownership of the property, and the validity of the August 14, 1986, conveyance.  Similarly, each child subsequently conveyed, in their individual capacity, at least one lot to a private purchaser.  These conveyances were not only public representations filed in the registry of deeds, as discussed _supra,_ but also constitute direct private communications to the purchasing third parties that the chain of title was accurate as recorded.[5]

Second, the children were aware of the facts that underlie their current attack on the conveyance during the roughly four year period in which they conducted themselves as if the chain of title was accurate.  Specifically, each child was aware of Elizabeth's diminished physical and mental health on August 14,

---

[5]The court also notes that from August 14, 1986, until early 1990, Tom and, to a lesser degree William and Paula, engaged in an extensive pattern of conduct in which they explicitly represented to various professionals, including Ciardi, Dyer, Prusky, and accountants, that the recorded chain of title was accurate.  These professionals, in turn, acted on these representations when performing their duties.  As defense counsel acknowledged at trial, the children are held to the representations made by retained professionals on their behalf, even where those representations later appeared to have been imprudent.

45

1986, and during the ten days that preceded her death on August 24, 1986. Tom knew about the execution of the deed at the time it took place, Paula knew or had reason to know about its recordation the following day, and William personally knew of these key events soon thereafter and, by virtue of the partnership with his siblings, constructively knew of the events as they transpired. Likewise, each child testified that they never intended to be partners and that no partnership did or could have existed at the time of the conveyance. Accordingly, the court finds that at the time the children represented to others, by word and conduct, that the conveyance was proper, they were aware of important facts to the contrary, i.e., those relative to Elizabeth's donative capacity.

Third, the court finds that the children's representations concerning the validity of the conveyance were made to third parties who were ignorant of the truth of the matter. There was no evidence in the recorded chain of title to indicate that the conveyance was voidable or even that there existed a question concerning Elizabeth's donative capacity.[6] Meanwhile, the

---

[6]Because the court has found that the partnership existed on August 14, 1986, the children's knowledge concerning the partnership formation matters, although concealed by their words and conduct, is irrelevant to the equitable estoppel analysis because third parties were not injured by the representation that the partnership existed. Even assuming that various third parties knew the legal status of the partnership was in question,

46

children, who were intimately familiar with their mother's illness, represented that the recorded chain of title was accurate to a variety of third parties other than the plaintiff, including, <u>inter</u> <u>alia</u>, the registry of deeds, upon which the general public relies, the Alton planning board, and those individuals who actually did purchase lots directly from Tom, William, and Paula. None of these parties had any reason to question the capacity of an earlier donor and, as a practical matter, were probably not even in a position to inquire about the medical condition of a prior title holder.

Fourth, the children made the representations concerning the correctness of the chain of title and, implicitly, the validity of the August 14, 1986, conveyance, with the knowledge that the representations would be reasonably relied upon and acted upon by others. Indeed, the very purpose of land recordation is to place the public on notice of who owned a given property at a given time. By recording the August 14, 1986, conveyance the partnership misled the public. The recordation of each subsequent conveyance in the chain of title, several of which involved deeds signed by the individual children and by the

---

this fact does not prevent the court from equitably estopping the children from challenging the conveyance because the third parties were on notice of a potential problem which, given the court's ruling, never ripened into a real problem.

47

partnership, compounded the representations.  Finally, the representations that CPA and, later, Tom, owned the property were relied upon by other individuals and institutions: The town approved the partnership's subdivision application, the bank took a security interest in exchange for a multi-million dollar loan, and individual purchasers spent up to $310,000 to acquire title to a lot.  In addition, the public's ability to rely upon the integrity of the registry of deeds was compromised in a very real way.

Meanwhile, the evidence establishes that the children actually intended third parties to rely on these representations. At trial Fred testified that the children and Ciardi knew that Tom had erred by recording the August 14, 1986, deed and that this error could impede the development of the land.  When asked by the court why the family would perpetuate the charade that a valid conveyance took place, Fred explained that "the mistake had already been made on the record" and that Ciardi and Tom and the bank wanted to go forward nonetheless.

The need for equitable estoppel in this case is compelling. The children proceeded for approximately four years engaged in business transactions based on a chain of title of their own creation.  For most of that time this path suited their needs: William and Paula sold their interests for a considerable amount

48

of money with a minimum of effort while Tom was able to secure financing and take other steps towards his development plans. However, this deeply entrenched pattern of conduct abruptly ended sometime in 1990 when, faced with a potentially expensive IRS investigation concerning the tax treatment of the property, the children became convinced that it made better sense to disavow the gift and, instead, assume the contrary position that the property was distributed through their mother's estate. At trial the children conceded past errors, attributing them to a variety of factors, the majority of which involves the professional incompetence of trusted advisors along with related explanations of naivete, honest confusion, lack of experience in technical matters, and miscommunication. In the opinion of the court, these explanations and other efforts to disown the past and to deflect blame to others are disingenuous, lacking in credibility, and motivated by the children's understandable fear of a gift tax lien.

The doctrine of equitable estoppel does not require a finding that the estopped party acted with the specific intent to deceive or prejudice others and, as such, the court need not determine whether the children are as blameless as they claim or are shameless opportunists who changed positions in a transparent effort to improve their financial position, as Hilco intimates.

49

Rather, it is sufficient that the children acted consistently for an extensive period of time; that this conduct concealed material facts and over time actually magnified the effect of the concealment; that the children knew their representations would likely be relied upon and, in fact, in some instances were relied upon; and that established public policy and the rights of ignorant third parties were compromised.  It is true that certain legal principles would permit the children to disavow their past conduct and void the August 14, 1986, conveyance on the grounds of donor incapacity.  However, having created and capitalized on their prior position, equitable considerations operate to prevent the manifest unfairness and disruption that would accompany judicial recognition of their more recent repudiation of the chain of title.  Despite the court's finding that Elizabeth Boyer lacked the requisite capacity at the time she executed the deed, fairness, equity, and sound public policy bar the children from raising this legitimate challenge or being heard to raise any other challenge to the August 14, 1986, conveyance and the chain of title deriving therefrom.[7]

_____

[7]The court's application of equitable estoppel in this case reflects other equitable principles recognized by the New Hampshire Supreme Court.  For example, the fact that the children waited approximately four years to raise the issue of Elizabeth's capacity indisputably compromises, and arguably forecloses, their litigation position.  See In re Estate of Lund, 118 N.H. 180, 186, 385 N.H. 111, 114 (1978) (in will contest, "[i]t was

50

B. Estoppel By Deed

In addition to equitable estoppel, New Hampshire courts also recognize the doctrine of estoppel by deed, which provides that

> [a] party who has executed a deed, is thereby estopped from denying not only the deed itself, but every fact it recites and every covenant it contains. The defendant, by his deed, among other things , covenanted that he had good right and lawful authority to convey the demanded premises to the plaintiff; he is, therefore, estopped to deny his title to those premises, as well as his grant thereof to the plaintiff.

Hilco Realty Corp. v. United States, No. 93-390-JD, slip op. at 6 (D.N.H. Aug. 18, 1994) (quoting Foss v. Strachn, 42 N.H. 40, 41 (1860)); see also 700 Lake Avenue Realty Co. v. Dolleman, 121 N.H. 619, 624-26, 433 A.2d 1261, 1264-65 (1981). Thus, in "a court of law or equity, a party cannot controvert the legal

---

incumbent upon [party seeking to set aside prior approval of will] to take immediate action to protect their interest; not to do so was neglect chargeable against them"). Moreover, courts in other jurisdictions have long estopped parties from challenging the validity of a will after accepting benefits under the will. See, e.g., Silling v. Erwin, 885 F. Supp. 881, 892-93 (S.D. W. Va. 1995) ("a beneficiary who accepts such benefits is bound to adopt the whole contents of the will and is estopped to challenge its validity," where "the acceptance was of such a nature as to give rise to equitable considerations which prevent the accepting party from later negating the instrument through which he received benefits") (quotations omitted); Kellner v. Blaschke, 334 S.W.2d 315, 319-20 (Tex. Ct. App. 1960) (noting that "[c]onduct which is inconsistent with the theory that the will is invalid, or which misleads other parties, operates as an estoppel") (quoting 57 Am.Jur. § 802).

effect of his deed of record, and a grantor is estopped to deny the title of his grantee." <u>Foss</u>, 42 N.H. at 42. The doctrine

> rests upon the inequity of allowing the party estopped from asserting a contrary position. The principle is that when a man has entered into a solemn engagement by deed, he shall not be permitted to deny any matter he has asserted therein, for a deed is a solemn act to any part of which the law gives effect as the deliberate admission of the maker; to him it stands for truth, and in every situation in which he may be placed with respect to it, it is true as to him.
>
> . . . A person who is examining the record title to realty should be able to rely on the doctrine of estoppel by deed, without the necessity of having to investigate the possibility of a personal obligation to pay a money debt which might offset the estoppel by deed.

28 Am.Jur. 2d, Estoppel and Waiver § 5 (1966); <u>see</u> <u>Southland Corp. v. Shulman</u>, 331 F. Supp. 1024, 1029 (D. Md. 1971) ("The doctrine is based on the principle of giving effect to the manifest intention of the grantor appearing on the deed, as to the interest to be conveyed, and of preventing the grantor from derogating from or destroying his own grant by any subsequent act.") (citing authority from Fifth Circuit and Court of Claims). Consistent with this goal, the doctrine estops the grantor and his privies from denying the title granted by the deed, the factual representations included on the face of the deed, and the "necessary implication[s] created by" the text of the deed. <u>700 Lake Avenue Realty</u>, 121 N.H. at 626, 433 A.2d at 1265 (recognizing property right of implied easement under estoppel

52

theory).  As with equitable estoppel, a party may not be estopped by his deed absent evidence that the representations contained therein "induce[d] another to act in reliance and to change position."  Kirkpatrick v. Jones, 122 N.H. at 438, 440, 446 A.2d 80, 81 (1982) (citing Rautenberg v. Munnis, 108 N.H. 20, 23, 226 A.2d 770, 772 (1967)); cf. Kellison v. McIsaac, 131 N.H. 675, 681-82, 559 A.2d 834, 838 (1989) (no estoppel by recitals where plaintiff did not rely on deed).

The children's conduct and its unfortunate aftermath compel the equitable remedy of estoppel by deed.  The court has already concluded, supra, that the August 14, 1986, deed is voidable on account of Elizabeth's lack of donative capacity and that on or immediately following that date the children were aware of their mother's ill-health.  Despite this knowledge, on multiple occasions the children, acting in their individual capacities and as a partnership, executed deeds which on their face defined the subject property by direct reference to either the August 14, 1986, deed or by reference to deeds which conveyed title derivative of that deed.  See, e.g., Plaintiff's Exs. 2, 4-8, 17, 18.  For example, by warranty deed of June 1987, each child, as a CPA partner, conveyed to Tom "the same premises described in deed of Elizabeth H. Boyer to Campfire Point Associates, dated August 14, 1986."  By virtue of their signatures the children not only

directly covenanted that they owned the property that each signed deed purported to convey, but also that the chain of title they referenced and incorporated by deed was, to the best of their knowledge, sound. It is of no moment that the children did not sign the August 14, 1986, deed given their execution of directly derivative deeds which incorporated by reference the original deed. Indeed, even if each deed did not contain the direct references to the recorded chain of title, the children still would be estopped from denying the validity of the chain because invalidity would necessarily mean they did not own the property that each signed deed purported to convey.

The children argue that they cannot be estopped because the bank could have protected itself by investigating the legal status of the partnership and, thus, did not reasonably rely on the representations contained in the deed. The argument fails. As discussed <u>supra</u>, the evidence establishes that various third parties other than the bank, such as the individual purchasers of lots 18 and 19, <u>e.g.</u>, Plaintiff's Exs. 17 & 18, did reasonably rely on the representations contained in the deeds and those apparent from the recorded chain of title.[8] The reasonable

---

[8]The court notes that, regardless of the extent of its knowledge, the bank obviously did rely on the recorded chain of title because it recorded a multi-million dollar security interest in that chain.

54

reliance element is not mechanistic and, in cases like this where numerous third parties face unfairness and prejudice, there is no requirement that each beneficiary of estoppel have innocently relied to the same degree. Rather, the reliance requirement prevents undeserving litigants from employing equitable doctrines to achieve inequitable court rulings. The sorely needed injection of equity into this case presents no such risk. In any event, to the extent the children argue that the bank was on notice that the August 14, 1986, conveyance was imperiled because of a deficiency in CPA's status, the court has ruled that the partnership existed at the time.[9]

The court considers the execution and recordation of deeds to be legally significant acts. By design these are public acts, the very purpose of which is to induce reliance by providing the government and the citizenry with consistent and trustworthy title information. The children do not possess the same reverence for the land recordation system and do not appreciate the legal and policy consequences that their conduct has engendered. They have signed and recorded numerous deeds as if these were pro forma chores and, in so doing, have created a

---

[9]The court's estoppel rulings are not based on any factual findings concerning the bank's knowledge and conduct relative to its financing of the development as these matters, to the extent they are relevant to lien priority or other issues in the case, are reserved for future stages of the trial.

55

public chain of title. Having realized financial gain from their course of conduct, the children now seek to rewrite a history of their own creation in yet another attempt to bolster their financial position. The registry of deeds is not a pliable system that permits record holders to rescind their solemn representations whenever rescission appears financially or legally expedient. Accordingly, the children are estopped by their own property deeds from voiding or otherwise challenging either the August 14, 1986, conveyance as recorded or its progeny.

## IV. The Government is Bound by the Court's Estoppel Rulings

The relationship between the government and the children is curious. At trial, the defendants jointly presented their position that, regardless of the chain of title actually recorded, the August 14, 1986, deed did not convey the property because Elizabeth lacked donative capacity and/or because CPA was not a partnership which could legally accept the title the deed purported to convey. Thus, the defendants assert title passed through Elizabeth's estate upon her death ten days later.

The government apparently abandons the unified defense when confronted with Hilco's estoppel theory. Instead, it argues that even if estoppel bars "the other defendants [the children] from

56

now disclaiming the validity of the interest they claimed to have received in August 1986 . . . . [i]t does not, however, bar an innocent third party creditor from asserting its interest in the property." United States' Opposition to Motion for Summary Judgment, 2/2/94, at 4-5. More recently, the government has responded to the analytically similar ratification argument, which the court does not reach, by reincorporating the innocent third party argument and by further arguing that although the taxpayer's property rights are defined by state law, the extent of the IRS' interest, including the priority of the lien, are determined by federal law. See United States' Opposition to Motion for Summary Judgment, 3/28/96, at 11-12.

Federal law governs issues of federal tax lien priority. E.g., Progressive Consumers Federal Credit Union v. United States, 79 F.3d 1228, 1234-35 (1st Cir. 1996) (listing authorities); Gardner v. United States, 34 F.3d 985, 987 (10th Cir. 1994); In re Adler, 869 F. Supp. 1021, 1026-27 (E.D.N.Y. 1994). However, "it is equally well-settled that in the application of a federal revenue act, state law controls in determining the nature of the legal interest . . . in the property to be reached by the statute." Progressive Consumers Federal Credit Union, 79 F.3d at 1235 (quoting Aquilino v. United States, 363 U.S. 509, 513 (1960)); accord Avco Delta Corp. Canada

<u>Ltd. v. United States</u>, 459 F.2d 436, 440 (7th Cir. 1972) ("federal court must look to state law to determine the nature of the legal interest which the taxpayer had in the property sought to be reached.") (citing <u>Aquilino</u>, 363 U.S. at 512-13). This is because "state law creates legal interests and rights in property [while] federal law determines whether and to what extent those interests will be taxed." <u>United States v. Irvine</u>, 114 S. Ct. 1473, 1481 (1994); <u>accord</u> <u>United States v. Bess</u>, 357 U.S. 51, 55 (1958) (federal tax laws "creat[e] no property rights but merely atta[ch] consequences, federally defined, to rights created under state law"). Finally, in the federal tax lien context, it makes no difference whether the state law principles used to determine the relevant property interest arise under statute or common law, <u>e.g.</u>, <u>Gardner v. United States</u>, 814 F. Supp. 982, 984-85 (D. Kan. 1993), or arise through equitable doctrines of estoppel, <u>e.g.</u>, <u>Avco Delta Corp. Canada Ltd.</u>, 459 F.2d at 440-41.

Accordingly, the court's legal analysis of the nature and extent of the government's security interest is divided into two distinct stages. Initially the court applies New Hampshire law to determine the "nature of the legal interest the taxpayer has in the property in question." <u>See</u> <u>Cramer v. Burnham</u>, No. 91-100-S, 1994 WL 240394 at * 2-3 (D.N.H. 1992) (quoting <u>United States v. V & E Eng'g & Constr. Co.</u>, 819 F.2d 331, 333 (1st Cir. 1987));

see also United States v. Comparato, 22 F.2d 455, 457 (2d Cir.),
cert. denied, 115 S. Ct. 481 (1994) ("State law controls whether
a taxpayer has an interest in property to which a lien may
attach.") (citation omitted).  As a practical matter, the
definition of the taxpayer's property interest under state law
invariably yields very real federal tax lien consequences because

> [T]he government's rights can rise no higher than those
> of the taxpayer to whom the property belongs; for
> example, the lien for a partner's unpaid income taxes
> attaches to his interest in the firm, not to the firm's
> assets.  In the same vein, the lien arising from the
> unpaid taxes of a person who purchased property under a
> conditional sale or chattel mortgage before the
> assessment was made attaches to the taxpayer's equity
> and is inferior to the seller's security interest.
> Moreover, the tax collector not only steps into the
> taxpayer's shoes but must go barefoot if the shoes wear
> out; thus, a state judgment terminating the taxpayer's
> rights to an asset also extinguishes the federal tax
> lien attached thereto.

Rodriquez, 740 F.2d at 99 (quoting 4 B. Bittnker, Federal
Taxation of Income, Estates and Gifts ¶ 111.5.4, at 111-102); see
Gardner, 34 F.3d at 988 (same); Avco Delta Corp. Canada Ltd., 459
F.2d at 441 ("In other words, the rights of the government rise
no higher than those of the taxpayer whose property is sought to
be levied on.") (citing Karno-Smith Co. v. Malony, 112 F.2d 690,
692 (3d Cir. 1940)).  For this reason, "a tax lien cannot attach
to any property that was transferred before the assessment."
Gardner, 814 F. Supp. at 985.

Once the taxpayer's property interest has been defined, the tax consequences of that property interest, including the application and dimensions of a federal tax lien, are governed by federal law. See id. At this point, "state law becomes inoperative." Id.; accord Miller v. Alamo, 975 F.2d 547, 552-53 (8th Cir. 1992); Adler, 869 F. Supp. at 1026. Thus, even though state law determines what property a taxpayer owns that may be subject to a tax lien, once the lien attaches, state law may not be invoked in any manner which would diminish, subordinate, or otherwise offend the lien. See Comparato, 22 F.3d at 457-58; Miller, 975 F.2d at 552; Adler, 869 F. Supp. at 1026-27. "[O]nce it has been determined the debtor has property, state law cannot be used as a shield against the government's tax lien." Miller, 975 F.2d at 552-53. For example, in Comparato, the Second Circuit ruled that once a tax lien encumbered the taxpayers' property interest, the taxpayers could not invoke state law to redefine their property interest by renouncing their ownership, even where the applicable state statute treated such renunciations as "retroactive to the creation of the property disposition." 22 F.3d at 456-68; see United States v. Mitchell, 403 U.S. 190, 203-04 (1971) (renunciation under state law cannot defeat federal tax lien attached to property rights that vested prior to renunciation); Adler, 869 F. Supp. at 1026 (renunciation

60

of wrongful death proceeds under state law cannot defeat federal tax lien); see also Gardner, 34 F.3d at 988-89 (IRS lien against ex-husband cannot attach to property where property rights vested in ex-wife prior to time of assessment); Rodriguez v. Escambron Development Corp., 740 F.2d 92, 98-99 (1st Cir. 1984) ("The Supreme Court has rejected efforts to apply 'relation back' doctrine to subordinate a tax lien to a subsequently perfected state law lien.") (citations omitted). But see Mapes v. United States, 15 F.3d 138, 139-41 (9th Cir. 1994) (valid state renunciation of inherited property defeated tax lien with respect to renounced property).

The court has found, supra, that the August 14, 1986, deed was a valid conveyance by gift to the partnership but, because Elizabeth lacked donative capacity, the conveyance was voidable. Prior to Elizabeth's death on August 24, 1986, neither Elizabeth nor the children undertook to void that conveyance and, as such, she was not seized of the property upon death. For the same reason, when the federal estate tax lien attached to the estate on August 24, 1986, it did not attach to the Alton property which had already been validly conveyed to CPA. Contrary to the government's assertion, the August 14, 1986, conveyance, a state law creature, did not strip or otherwise defeat the government's estate lien on the Alton property, a federal law creature,

61

because the lien never attached to the property in the first place: The property was validly gifted ten days before the estate or the lien existed.

The government argues that even if the property was not part of the estate, Elizabeth's right to void or rescind the valid-but-voidable gift itself constitutes a chose in action which was inherited by the estate and, thus, is subject to the estate lien. The argument fails. First, as the government has acknowledged in its memoranda, state property law is "wholly irrelevant" from the time a federal tax lien attaches, United States Trial Memorandum at 8-9, even where the state law would operate retroactively to redefine a property interest held by the taxpayer/estate. Thus, even assuming the government did acquire by lien Elizabeth's right to void her deed and thereby reclaim ownership of the property, the government could not trigger this state law right to void because the very means by which the government acquired the right, i.e., the attachment of the lien at death, simultaneously prevented state law from relating back and redefining the property to be attached. In other words, the moment the lien attached to the estate, the estate could no longer rely on state law to redefine the property interests that were attached. Accordingly, once encumbered by a federal tax lien a taxpayer cannot invoke state law to redefine the nature

and the extent of the property, even where the state law operates retroactively or otherwise relates back to the date of an earlier transaction, such as the renunciation of an earlier gift or the ratification of an earlier transaction. The government takes its taxpayers (dead or alive) as it finds them and its lien only reached the property held by the estate. To the extent the attached property included an unexercised right to void, the very lien through which the government received the unexercised right prevented its operation.

The government's argument also fails as a matter of fact. The court has ruled that, under either of two state law doctrines, the children were estopped from voiding or otherwise challenging the August 14, 1986, conveyance for any reason. Both estoppel rulings, which are treated as factual findings under state law, were compelled by patterns of conduct which began prior to Elizabeth's death and continued for approximately four years. The estoppel findings not only bind the children as individuals, partners, and, in the case of William and Tom as executors, but also bind their privies. See, e.g., 700 Lake Avenue Realty Co., 121 N.H. at 625-26, 433 A.2d at 1265. The Boyer children stood in direct privity with Elizabeth and her estate by blood and, by virtue of Elizabeth's appointment of Tom and William as executors of her estate, were in privity by

63

representation.[10]  Thus, at the time the government lien attached

to the estate, and certainly by the time it raised the chose in

action/voidability argument before the court, the estate was

already bound by its own and its representatives' course of

conduct which compelled operation of the equitable doctrines.

So, even though truly innocent third parties should not be

estopped by the conduct of others, in this case Elizabeth and her

estate are estopped by virtue of the conduct of her privies.

Because the government's property rights are no greater than

those held by the estate, it is estopped as well.

Finally, the court rejects as untenable the government's

suggestion that even if the children are estopped to deny the

validity of the chain of title, such a finding should not be

applied to the detriment of third-party creditors.  The argument

portends a certain legal fiction whereby the chain of title

remains accurate as recorded with respect to the children's

interests but is treated as invalid with respect to the

government's tax interests.  Under this reasoning, the August 14,

1986, deed would be burdened by multiple personalities: It would

serve as a valid gift and progenitor of the recorded chain of

---

[10]For example, the estate's March 8, 1990, federal tax
protest, which affirmatively stated that the August 14, 1986,
deed effectively conveyed the property to CPA, was signed under
the penalties of perjury by Tom in his capacity as executor.  See
Plaintiff's Ex. 97.

title yet simultaneously be rejected for tax collection purposes as a failed attempt to convey property which, in actuality, passed through the estate and down an unperfected chain.

The court recognizes that in many lawsuits it may be permissible and even preferable for a litigant to be estopped from asserting a legal position against one party which, because of the equities involved, he could still assert against another. However, such an approach would yield an absurd result in this case because the court has used state law estoppel to define a property interest and a chain of title. Simply stated, the land at issue either travelled down the recorded chain, as the court has found, or it did not, as the defendants insist. It cannot go both ways. The land recordation system is not only grounded in reality but its very essence depends on public notice and reliability. For this reason, equity demands that the court settle matters of property ownership and record title in a uniform manner.

Conclusion

The Boyer children, through their words, conduct, and that of certain retained professionals, have created what their current counsel has charitably termed "[t]he reign of chaos."

65

The court has employed various equitable doctrines, a fairness device of last resort, to instill order and justice to this unfortunate state of affairs.

The court finds that at the time Elizabeth Boyer executed the August 14, 1986, deed, her donee, Campfire Point Associates, a New Hampshire general partnership consisting of Tom, William, and Paula, legally was capable of accepting title. The court also finds that Elizabeth lacked the requisite donative capacity at the time.

The court further finds that the Boyer children, as individuals and in their capacities as partners and executors, are equitably estopped and are estopped by deed from voiding or otherwise attacking the validity of the August 14, 1986, conveyance, which would otherwise have been voidable on the ground of donor incapacity, or from disavowing the recorded chain of title. Accordingly, at all times title to the property passed as recorded in the Belknap County Registry of Deeds. Moreover, the court's rulings with respect to the validity of the August 14, 1986, conveyance and the resulting chain of title apply with equal force to the government.

66

The clerk shall schedule a status conference.

SO ORDERED.

 

 

_____
Joseph A. DiClerico, Jr.
Chief Judge

June 3, 1996

cc:  Scott H. Harris, Esquire
     Andrew W. Serell, Esquire
     Thomas W. Ostrander, Esquire
     Byron R. Prusky, Esquire
     Duncan J. Farmer, Esquire
     Warren C. Nighswander, Esquire
     Arnold Rosenblatt, Esquire